# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-10-00111-CV

**Commission on State Emergency Communications, Appellant**

**v.**

**TracFone Wireless, Inc. and Virgin Mobile USA, LP, Appellees**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT
NO. D-1-GN-08-003039, HONORABLE ORLINDA NARANJO, JUDGE PRESIDING**

### O P I N I O N

Appellees TracFone Wireless, Inc. and Virgin Mobile USA, LP (collectively, "the Prepaid Providers") sued the Commission on State Emergency Communications ("the Commission") for judicial review of the agency's final order concluding that the 9-1-1 emergency service fee imposed by health and safety code section 771.0711 applies to the wireless telecommunications connections the Prepaid Providers provide to their customers. *See* Tex. Health & Safety Code Ann. § 771.0711 (West 2010). The district court reversed the Commission's order, and this appeal followed. We will reverse the district court's judgment.

### BACKGROUND

Chapter 771 of the Texas Health and Safety Code governs the administration of emergency communications in Texas and provides that the Commission is the State's authority on emergency communications. *See id.* § 711.051(a) (West 2010). The Commission has primary

responsibility for administering the implementation of a statewide system that ensures that wireless callers can be identified and located when they dial 9-1-1 for emergency assistance. *Id.* §§ 771.051(a)(2)(A), .0711(a). To fund the system, section 771.0711 provides that the Commission "shall impose on each wireless telecommunications connection a 9-1-1 emergency service fee." *Id.* § 771.0711(a). The statute further provides that a wireless service provider must collect the fee "in an amount equal to 50 cents a month for each wireless telecommunications connection from its subscribers" and must pay the money collected to the Comptroller "not later than the 30th day after the last day of the month during which the fees were collected." *Id.* § 771.0711(b). Section 771.073 requires that the service provider "collect the fees [] in the same manner it collects those charges for service" and that the fee must be "stated separately on the customer's bill." *Id.* § 771.073(a) (West 2010).

Customers pay for wireless telecommunications connections and services using one of two different methods: postpaid and prepaid. A customer who obtains a connection from a postpaid provider typically pays a set amount monthly for the use of up to a specified number of minutes each month and pays additional fees for any minutes used in excess of that specified number. A postpaid provider sends its customers a monthly bill assessing charges for the connection and for the services used during the preceding month, usually measured in minutes. The Prepaid Providers, on the other hand, provide their customers with the wireless telecommunications connection and services on a prepaid basis. They do not enter into extended term contracts with their customers and, because their customers pay in advance, do not send them periodic bills. The Prepaid Providers' customers pay for their wireless telecommunications connection and service in advance

2

by purchasing a handset and a wireless card, which is denominated for either a fixed dollar amount of service or a fixed number of minutes of service. Customers typically purchase the handset and wireless card from a third-party retailer such as Wal-Mart or Target, although they may also purchase them directly from the Prepaid Providers using the internet. After purchasing the handset and wireless card, the user contacts the Prepaid Providers by telephone or over the internet to request that the handset be activated. When activated, each handset is assigned a telephone number with an area code based on a ZIP code provided by the user, thereby establishing a wireless telecommunications connection. The wireless card allows the customer to use the handset to make calls until either the number of purchased minutes or the dollar amount of service is used up. The customer may later purchase additional minutes or dollar amounts of use for a TracFone or Virgin Mobile handset by purchasing an additional wireless card and entering the code printed on that card. The connection represented by the assigned telephone number is automatically deactivated after 90 days (plus a grace period) unless it is renewed by the purchase of additional minutes.

For the time period between January 1, 2001 and September 30, 2003, TracFone paid the Comptroller $767,515.26 as 9-1-1 emergency service fees pursuant to health and safety code section 771.0711. For the time period between November 1, 2002 and May 1, 2005, Virgin Mobile paid the Comptroller $1,525,484.07 as 9-1-1 emergency service fees. In 2005, TracFone and Virgin Mobile filed refund requests with both the Commission and the Comptroller, seeking a refund of the entire amounts paid. The refund requests were based on their contention that section 771.0711 does not apply to the prepaid wireless products they provide and therefore the wireless

3

telecommunications connections obtained by their customers are not subject to the 9-1-1 emergency service fee imposed by that statute.

On receiving the refund requests, the Commission sought an opinion from the Texas Attorney General as to which agency—the Commission or the Comptroller—had primary jurisdiction to determine, in the context of a claim for a refund, "whether a 9-1-1 emergency service fee imposed on wireless telecommunications connections by Texas Health and Safety Code section 771.0711(a) applies to a service provider's specific service." The Attorney General issued an opinion stating that the Commission had the authority to determine whether section 711.0711(a) applies to a wireless service provider's particular service, while the Comptroller had the authority to order a refund of fees collected pursuant to that section. *See* Op. Tex. Att'y Gen. No. GA-0401 (2006). The Attorney General further stated:

> A claim for a refund of the fee imposed under that section must be filed with the Comptroller, but if the claim presents issues particularly within the Commission's expertise, the Comptroller should abate the administrative proceeding to allow the Commission to make the initial determination of those issues.

*Id.* Following the issuance of this opinion by the Attorney General, the Commission initiated a contested case against the Prepaid Providers and referred the case to the State Office of Administrative Hearings (SOAH) to determine whether section 771.0711 applies to the prepaid wireless telecommunications connections they provide. The Comptroller abated the refund proceedings pending resolution of the contested case by SOAH.

After a hearing before a SOAH administrative law judge (ALJ), the ALJ issued a proposal for decision (PFD) in which she concluded that section 771.0711's provision imposing a

4

9-1-1 emergency service fee on "each wireless telecommunications connection" applied to the wireless telecommunications connections used by the Prepaid Providers' customers. In a final order issued in June 2008, the Commission adopted the PFD, including the proposed findings of fact and conclusions of law.

In August 2008, the Prepaid Providers filed in Travis County district court a petition for judicial review of the Commission's order. After full briefing and a hearing before the court, the district court rendered judgment reversing the Commission's order. In its judgment, the court stated that the Commission "erroneously concluded that Texas Health & Safety Code §§ 771.0711 and 771.073 apply to TracFone Wireless, Inc. and Virgin Mobile, L.P. and their end users during the periods at issue." This appeal followed. In two issues, the Commission contends that: (1) the fee imposed on wireless telecommunications connections by health and safety code section 771.0711(a) applies equally to all users of those connections regardless of whether they were purchased on a postpaid or prepaid basis, and (2) the Commission's final order did not violate the Prepaid Providers' constitutional rights, including their rights to due process and equal protection.

**STANDARD OF REVIEW**

The primary issue before this Court involves construction of a statute: whether the Commission correctly concluded that health and safety code section 771.0711 applies to the wireless telecommunications connections obtained by the Prepaid Providers' customers. Statutory construction presents a question of law that we review de novo. *See State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006). Our primary objective in construing statutes is to give effect to the legislature's intent. *Galbraith Eng'g Consultants, Inc. v. Pochucha*, 290 S.W.3d 863, 867 (Tex.

5

2009). The plain meaning of the text is the best expression of legislative intent unless a different meaning is supplied by legislative definition or is apparent from the context, or unless the plain meaning leads to absurd or nonsensical results. *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625-26 (Tex. 2008); *see* Tex. Gov't Code Ann. § 311.011 (West 2005) ("Words and phrases shall be read in context and construed according to the rules of grammar and common usage."). We look to the entire act in determining the legislature's intent with respect to a specific provision. *Upjohn Co. v. Rylander*, 38 S.W.3d 600, 607 (Tex. App.—Austin 2000, pet. denied). We are required to give "serious consideration" to the construction of a statute by the administrative agency charged with its enforcement, *Railroad Comm'n v. Texas Citizens for a Safe Future & Clean Water*, No. 08-0497, 2011 WL 836827, at *4 (Tex. Mar. 11, 2011), and will generally uphold the agency's interpretation "so long as the construction is reasonable and does not contradict the plain language of the statute." *First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 632 (Tex. 2008) (quoting *Tarrant Appraisal Dist. v. Moore*, 845 S.W.2d 820, 823 (Tex. 1993)); *see also Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 747-48 (Tex. 2006) (courts give some deference to agency regulation containing reasonable interpretation of ambiguous statute). If, after applying these dominant rules of construction, doubt about a tax statute's application still remains, we give the statute a "stricter construction," *Calvert v. Texas Pipe Line Co.*, 517 S.W.2d 777, 781 (Tex. 1974), meaning that we resolve ambiguities in favor of the taxpayer and against the taxing authority, *Gables Realty L.P. v. Travis Cent. Appraisal Dist.*, 81 S.W.3d 869, 872 n.3 (Tex. App.—Austin 2002, pet. denied).

**DISCUSSION**

At issue is whether section 771.0711(a) of the health and safety code applies to the prepaid wireless telecommunications connections obtained by the Prepaid Providers' customers. Section 771.0711(a) provides:

> To provide for automatic number identification and automatic location identification of wireless 9-1-1 calls, the commission shall impose on *each wireless telecommunications connection* a 9-1-1 emergency service fee. A political subdivision may not impose another fee on a wireless service provider or subscriber for 9-1-1 emergency service.

Tex. Health & Safety Code Ann. § 771.0711(a) (emphasis added). A "wireless telecommunications connection" is defined as "any wireless communication mobile station assigned a number containing an area code assigned to Texas by the North American Numbering Plan Administrator that connects a wireless service provider to the local exchange service provider." *Id.* § 771.001(13) (West 2010). Thus, the plain language of section 771.0711(a) imposes a 9-1-1 emergency service fee on *each* wireless telecommunications connection and contains no language limiting its scope based on the manner in which the wireless user purchases that connection. It is undisputed that customers of the Prepaid Providers obtain a "wireless telecommunications connection" through their purchase and activation of a handset. We agree with the Commission, therefore, that the plain language of section 771.0711(a) requires that the fee be imposed on *all* wireless telecommunications connections, including those provided by the Prepaid Providers to their customers on a prepaid basis.

We must, however, consider the statute as a whole and not any provision in isolation. *See Continental Cas. Co. v. Downs*, 81 S.W.3d 803, 805 (Tex. 2002). The Prepaid Providers

7

contend that the statute's specific fee assessment and collection methods evidence a legislative intent that their customers, who pay for their wireless telecommunications connections in advance, are not subject to the 9-1-1 emergency service fee. *See* Tex. Health & Safety Code Ann. §§ 771.0711(b); .073. They argue that these separate statutory provisions define section 771.0711's true scope and demonstrate that the fee was never intended to apply to wireless telecommunication connections provided on a prepaid basis. We address each of their arguments below.

***Manner of Assessing and Collecting the Fee***

The statute provides that "[a] wireless service provider shall collect the fee in an amount equal to 50 cents a month for each wireless telecommunications connection from its subscribers and shall pay the money collected to the comptroller not later than the 30th day after the last day of the month during which the fees were collected." *See id.* § 771.0711(b). Section 771.073 prescribes the method for collecting the fee:

> A customer on which a fee or surcharge is imposed under this subchapter is liable for the fee or surcharge in the same manner as the customer is liable for the charges for services provided by the service provider. The service provider shall collect the fees and surcharges in the same manner it collects those charges for services, except that the service provider is not required to take legal action to enforce the collection of the fees or surcharges. A fee or surcharge must be stated separately on the customer's bill.

*Id.* § 771.073(a). The Prepaid Providers contend that these requirements, read in harmony with section 771.0711(a), reflect the legislature's intent to impose the fee only on telecommunications connections provided using the *postpaid* wireless service business model and not on those telecommunications connections that are obtained on a *prepaid* basis.

8

We do not agree that the statutory provisions addressing the method of assessing and collecting the fee demonstrate a clear intent to limit the fee to wireless telecommunications connections paid for in any particular manner. The Prepaid Providers characterize these provisions as requiring monthly billing, a practice they do not engage in. Nothing in the statute, however, requires that the fee be assessed in a monthly bill or collected on a monthly basis. Rather, the provision directs the provider to assess and collect a fee "in *an amount equal to* 50 cents a month." Although assessing a fee of exactly 50 cents due each month is one method that would accomplish the statutory directive, it is not apparent that it is the only way. And the provider is not required to remit the fees on a monthly basis; it is simply required to remit to the Comptroller any fees it has collected in a particular month no later than 30 days after the last day of that month.

The Prepaid Providers next assert that the statute's mandate that the fee be collected "in the same manner [the service provider] collects those charges for services" and that the fee "must be stated separately on the customer's bill" is incompatible with their business model. They rely on this alleged incompatibility to support their position that the statute contemplates imposing a fee only on the customers of wireless service providers that send out a monthly bill and therefore, they argue, demonstrates that "the sole object of the e911 fee contemplated by the legislature was the traditional model of monthly post-paid wireless service."[1] The statute does not, however, require that the

---

[1] The Washington Supreme Court rejected a similar argument advanced by TracFone that challenged the application of that state's enhanced 911 excise tax to prepaid wireless service. The court noted that the statute does not itself require that TracFone send its customers a bill, only that if a billing statement is sent, the tax must be stated separately. The court further noted that, "the fact that TracFone does not send monthly billing statements is a consequence of the way in which it chooses to conduct its business," and "does not relieve TracFone of its obligations under the taxing statute, nor does it convert a plainly taxable event into a nontaxable event." *TracFone Wireless, Inc. v. Department of Revenue*, 242 P.3d 810, 819 (Wash. 2010).

9

service provider send its customers bills or charge for its product in any particular manner. Rather, the statute effectively directs the provider to collect the fee in whatever manner it employs to collect other charges from its customers and to apprise the customer of the amount of that fee. The record does not show that it would be impossible for the Prepaid Providers' business practices to be reconciled with the statute.[2] Indeed, in the PFD, the ALJ described various ways in which the Prepaid Providers could meet the assessment and collection procedures under their prepaid business model. While their chosen business model may make it more difficult for them to assess and collect the fee, such a difficulty does not itself evince a legislative intent to exclude the telecommunications connections they provide from the reach of section 711.0711.[3] A wireless telecommunications

[2] The Washington Supreme Court addressed TracFone's contention that it could not comply with that state's statute imposing a 20 cent per month fee on "all radio access lines." TracFone asserted that this fee could not be uniformly calculated on prepaid wireless service because the service is sold in block airtime and not by the month. The court observed that the statute defines a "radio access line" as "the telephone number *assigned to or used by* a subscriber for two-way local wireless voice service" and continued:

> [TracFone's argument] misapprehends what is being taxed. . . . If a subscriber has a cell phone number assigned to the subscriber or used by the subscriber, the tax must be paid. The tax is not imposed on the sale of airtime minutes nor is the tax based upon the number or rate of minutes purchased or used in a month. . . . TracFone's arguments, which are focused on numbers of minutes purchased and the rate at which they are used, do not reflect the statute's taxation of telephone numbers for the months that they are active. . . . Uniformity, as with the tax itself, is [] concerned with access lines, not with how many minutes are used or the rate at which they are used. . . . As thus defined, uniformity is not the insurmountable problem that TracFone claims. . . . As explained, TracFone knows whether an access line with a zip code in this state is active in any given month. TracFone can therefore readily calculate the tax for any given month.

*TracFone Wireless, Inc.*, 242 P.3d at 816-18.

[3] Similar arguments by TracFone have failed in other jurisdictions. *See TracFone Wireless, Inc. v. Nebraska Public Serv. Comm'n*, 778 N.W.2d 452, 459 (Neb. 2010) ("TracFone's choice of

connection remains such regardless of the manner in which it is marketed and sold, and section 771.0711(a) imposes a fee on "each" wireless telecommunications connection.[4] The fact that the legislature apparently tailored the manner of assessing and collecting the fee to fit the then-predominant business model does not necessarily indicate an intent to exclude wireless telecommunications connections marketed using a different business model, particularly if, as the Prepaid Providers claim, that different business model was novel at the time the statute was enacted. It is too great a leap for us to infer that, when drafting the statute, the legislature intended to exclude this sector of the industry from the 9-1-1 emergency service fee.

*Definition of "Subscribers"*

The Prepaid Providers also argue that the plain statutory language applying the 9-1-1 emergency service fee to "each" wireless telecommunication connection is overcome because the statute elsewhere directs wireless service providers to collect the fee from their "subscribers" and, according to the Prepaid Providers, their customers are not "subscribers" as that term is used in the statute. *See id.* § 771.0711 (b). The legislature has not defined the term "subscriber," so we construe it according to its plain and common meaning unless a contrary intention is apparent from the

---

business model does not give it license to throw up its hands and pay nothing."); *TracFone Wireless, Inc.*, 242 P.3d at 815 (observing that "TracFone's arguments are premised chiefly on the way in which it conducts its business" and "[i]n effect, TracFone is seeking a decision that whether the tax is owed depends upon how a company decides to market and charge for its service or, to put it another way, whether the tax must be paid depends entirely upon the individual company's business model").

[4] *See TracFone Wireless, Inc.*, 242 P.3d at 818 ("We do not agree that the manner in which a clearly taxable event (an assigned cell phone number) is marketed can negate a tax that is otherwise clearly payable.").

11

context, or unless such a construction leads to nonsensical or absurd results. *See FKM P'ship, Ltd. v. Board of Regents of Univ. of Houston Sys.*, 255 S.W.3d 619, 633 (Tex. 2008); *see also* Tex. Gov't Code Ann. § 311.011. The Prepaid Providers contend that, applying a reasonable construction based on common usage, one must incur a "periodic and recurrent" obligation to be considered a "subscriber." They assert that their customers, who pay for their wireless telecommunication connections in advance, are not "subscribers" because the service they receive is not "pursuant to a periodic contract." The Prepaid Providers rely on a dictionary definition of the verb "subscribe" to support their position, but they include only a portion of that definition. The complete definition reads: "to enter one's name for a publication or service; *also*: to receive a periodical or service regularly on order." *See* Merriam-Webster Collegiate Dictionary 1244 (11th ed. 2008). Thus, even if it were controlling, this dictionary definition of the term "subscribe" does not compel the narrow construction urged by the Prepaid Providers.

Moreover, their own marketing materials belie their claim that the term's common meaning encompasses only one who "incurs a regular and periodic obligation in exchange for an ongoing or periodic provision of service." The ALJ noted in her PFD that "[o]n its website, TracFone states that it has over 6.5 million subscribers," and at least one version of a document setting forth Virgin Mobile's terms and conditions of service refers to purchasers of its products as both "customers" and "subscribers." Rather than infer from the statute's use of the term "subscriber" a legislative intent to exclude an entire subset of wireless telecommunications connections from the 9-1-1 emergency service fee, it is more reasonable to conclude that, like TracFone and Virgin Mobile themselves, the legislature used the terms interchangeably. An intent to exclude a particular subset

12

of wireless service users from the fee is even more unlikely if, as the Prepaid Providers contend, that category of users was not widely recognized when the statute was drafted.

Our construction of the term "subscriber" comports with the object the legislature sought to obtain in enacting the statute—to fund a system to provide enhanced 9-1-1 emergency services to *all* wireless users. *See* Tex. Gov't Code Ann. § 311.023(1) (West 2005). By requiring all wireless users who can access the benefits of the 9-1-1 system to contribute to the funds needed to provide automatic number and location identification, this construction also honors the presumption that the legislature intended the statute to effect a just and reasonable result. *See id.* § 311.021(3) (West 2005).

***Subsequent Legislation (Health and Safety Code Section 771.0712)***

In 2009, the legislature enacted health and safety code section 771.0712, which expressly applies to "prepaid wireless telecommunications service" and provides in part:

> [A] prepaid wireless 9-1-1 services fee of two percent of the purchase price of each prepaid wireless telecommunications service purchased by any method, shall be collected by the seller from the consumer at the time of each retail transaction of prepaid wireless telecommunications service occurring in this state . . . .

Tex. Health & Safety Code Ann. § 771.0712 (West 2010).[5] The Prepaid Providers assert that this

subsequent amendment to the health and safety code supports their position that section 771.0711

does not apply to the wireless products they provide because if, by virtue of section 771.0711, their

prepaid business model were already subject to the 9-1-1 emergency service fee, then passage of

section 771.0712 would have been unnecessary. The Prepaid Providers argue that the legislature's

passage of section 771.0712 is persuasive evidence that section 771.0711 was not intended to apply

to them. *See State Highway Dep't v. Gorham*, 162 S.W.2d 934, 937 (Tex. 1942); *Williamson Pointe*

*Venture v. City of Austin*, 912 S.W.2d 340, 345 (Tex. App.—Austin 1995, no writ) ("One

legislature's interpretation of a prior legislature's enactment may be persuasive but does not control

the interpretation of the prior act."). However, other cases state that one session of the legislature

does not have the power to declare the intent of a past session. *See Rowan Oil Co. v. Texas*

*Employment Comm'n*, 263 S.W.2d 140, 144 (Tex. 1953); *Ex parte Schroeter*, 958 S.W.2d 811, 813

(Tex. Crim. App. 1997) ("[O]ne session of the legislature does not have the power to declare the

intent of a past session, and a legislative construction of an act of another legislature is uniformly

---

[5] We note that section 771.0712 imposes a fee on "prepaid wireless telecommunications *service*," whereas 771.0711(a) imposes a fee on "each wireless telecommunications *connection*." The tax code defines "telecommunications services" as "the electronic or electrical transmission, conveyance, routing, or reception of sounds, signals, data, or information utilizing wires, cable, radio waves, microwaves, satellites, fiber optics, or any other method now in existence or that may be devised, including but not limited to long-distance telephone service." Tex. Tax Code Ann. § 151.0103 (West 2008). It is not clear that the legislature necessarily intended the two provisions to tax the same element of wireless telecommunications. *See* Tex. Health & Safety Code Ann. § 771.001(13) (defining "wireless telecommunications connection"); Tex. Tax Code Ann. § 151.0103 (defining "telecommunication services"); *see also Robertson v. Odom*, 296 S.W.3d 151, 157 (Tex. App.—Houston [14th Dist.] 2009, no pet.) ("[W]hen construing a statutory word or phrase, we may consider the meaning assigned to the term . . . in another act of similar nature."). Because we are not here construing section 771.0712, we express no opinion as to the significance, if any, of the legislature's use of different terms in the two provisions.

14

held to be entitled to little weight."); *Strayhorn v. Willow Creek Res., Inc.*, 161 S.W.3d 716, 722 (Tex. App.—Austin 2005, no pet.) ("[T]he intent or understanding of the 78th Legislature offers no insight into the intent of previous legislatures."); *Adams v. Baxter Healthcare Corp.*, 998 S.W.2d 349, 355 (Tex. App.—Austin 1999, no pet.).

Even if we consider section 711.0712 in construing 711.0711, however, it does not support the Prepaid Providers' position because there is an equally plausible alternative reason for the legislature to have added section 771.0712: that it may have recognized that the then-existing fee assessment and collection procedures were unwieldy as applied to service providers who sold wireless telecommunications connections on a prepaid basis and therefore amended the statute to permit those providers to collect the 9-1-1 emergency service fee in a manner more suited to their business model.

The Prepaid Providers also claim that when the legislature enacted section 771.0712, it *changed* the law and created a new fee on prepaid wireless. They argue that this legislative act is persuasive evidence that prepaid wireless is not within the scope of section 771.0711 and again contradicts, rather than supports, a construction of section 771.0711 as imposing a fee on prepaid wireless telecommunications connections. The Prepaid Providers assert that if later legislation differs significantly from existing law, the later legislation must be construed as changing, rather than clarifying, existing law. *See Williamson Pointe Venture*, 912 S.W.2d at 345. In the absence of some showing, either by legislative history or otherwise, that the intent of the legislature in adopting the amendment was to clarify rather than change the statute in question, we generally presume that legislative amendments are designed to *change* rather than *clarify* the existing statute.

15

*See Public Util. Comm'n v. Cities of Harlingen*, 311 S.W.3d 610, 620 n.7 (Tex. App.—Austin 2010, no pet.). "However, the time and circumstances surrounding the enactment of the amendment may indicate that the change wrought by the amendment was formal only—that the legislature intended merely to interpret the original act." 1A Norman J. Singer, *Sutherland Statutory* Construction § 22.30 (6th ed. 2002).[6]

Even employing the presumption of change, however, does not lead to the conclusion that the new provision here necessarily had the effect of imposing a *new fee*. The new provision addresses the manner of assessing and collecting the existing 9-1-1 emergency service fee specifically with respect to the prepaid wireless service. The *change*, then, arguably goes only to the manner in which prepaid wireless service providers assess and collect the 9-1-1 emergency service fee.[7] It is at least equally reasonable that the new provision resulted from the legislature's recognition of the need to accommodate the growing prepaid wireless business model. In response, the legislature may have drafted and passed a statute that prescribes a different and more suitable method for providers of prepaid services to calculate and collect the existing 9-1-1 emergency

[6] For example, if an amendment "was enacted soon after controversies arose as to the interpretation of the original act, it is logical to regard the amendment as a legislative interpretation of the original act." 1A Norman J. Singer, *Sutherland Statutory Construction* § 22.31 (6th ed. 2002).

[7] A Kentucky federal district court reached this conclusion when addressing a similar argument advanced by TracFone. The court noted that "the amendment only changed the method of collection, not the general collection obligation of cell phone providers." The court continued: "[T]he amendments do effect a change in the law; they change the permissible method of collection, adding new options to make it easier for prepaid providers to comply with the law while retaining the same business model." *See Commonwealth of Kentucky Commercial Radio Serv. Emergency Bd. v. TracFone Wireless, Inc.*, 735 F. Supp. 2d 713, 724 n.12 (W.D. Ky. 2010).

service fee.[8]  We do not agree that the legislature's enactment of section 771.0712 is inconsistent with our construction of section 771.0711.

The Prepaid Providers also claim that section 771.0712 represents a logical progression of taxation, which naturally lags behind emerging technologies.  They argue that just as 771.0711 was a new fee created to tax a new technology (wireless telecommunications connections as opposed to local exchange access lines, *see* Tex. Health & Safety Code Ann. § 771.071, commonly referred to as "land lines"), section 771.0712 is a new fee created to tax another new technology—prepaid wireless telecommunications connections as opposed to postpaid wireless connections.  But prepaid wireless telecommunication connections do not differ technologically from postpaid wireless telecommunication connections; the only difference is the business model employed by the Prepaid Providers.  The fee imposed by section 771.0711 is imposed on the *connection* itself, without regard to the manner in which that connection is marketed and sold to the user.

*Effect of Texas Tax Code*

The Prepaid Providers also contend that certain provisions of the tax code prohibit the assessment of a 9-1-1 emergency service fee on their prepaid customers' wireless telecommunications connections.  Specifically, they point to tax code section 151.061, which contains a provision prohibiting the imposition of taxes, charges, or fees on mobile

---

[8] If, as the Prepaid Providers insist, section 771.0712 imposes a *new* fee, it is not entirely clear that the legislature intended the new fee to be simply the "prepaid wireless" equivalent of the fee already imposed in section 771.0711.  As previously noted, section 771.0712 imposes a fee on "prepaid wireless telecommunications service" as opposed to the "wireless telecommunications connection" that is the subject of the fee imposed by section 771.0711.

telecommunications services provided to a customer in a taxing jurisdiction unless the customer's "place of primary use" is encompassed by the territorial limits of that taxing jurisdiction. *See* Tex. Tax Code Ann. § 151.061(c) (West 2008). Section 151.061 implements the federal Mobile Telecommunications Sourcing Act, 4 U.S.C.A. §§ 116-126 (West 2005), and establishes sourcing rules for state and local taxation of mobile telecommunications services. The bill analysis explains the background and purpose of section 151.061 as follows:

> As a result of some mobile telecommunications customers (customer) using service in various locations, several different state and local tax laws may apply. Federal law provides that a customer's place of primary use is the single source for determining tax revenue, regardless of where the call originates, passes through, or terminates. Conforming state law to federal law ensures that Texas limits the determination of tax revenue to a single source for a customer. Senate Bill 1497 conforms Texas law to federal law.

House Comm. on Ways & Means, Bill Analysis, Tex. S.B. 1497, 77th Leg., R.S. (2001).

Thus, section 151.061 (i) provides a framework for identifying the "place of primary use" of mobile telecommunications services, and (ii) permits taxes, fees, and charges on those services to be imposed only by the taxing authority whose jurisdiction encompasses that "place of primary use." *See* Tex. Tax Code Ann. § 151.061(c). Significantly, the sourcing rules apply only to "mobile telecommunications services." *Id.* The Prepaid Providers assert that users of the services they provide have no "place of primary use" because their services are excluded from the definition of "telecommunications services" and because the statute expressly defines "place of primary use" in terms of where a customer uses a "mobile telecommunications service." The statute defines "place of primary use" as

18

the street address that is representative of where the customer's use of the *mobile telecommunications service* primarily occurs. That location must be the residential street address or the primary business street address of the customer that is within the licensed service area of the home service provider.

*Id.* § 151.061(a)(2) (emphasis added). The Prepaid Providers claim that the mobile telecommunications products they provide do not fall within "telecommunications services" because the wireless card that accompanies the handset they sell to their customers constitutes a "telephone prepaid calling card," which is expressly excluded from the definition of "telecommunications services." *See id.* §§ 151.0103(a)(2), .01032. Since their customers are not using "telecommunications services," they assert, the statute does not assign them a "place of primary use." According to the Prepaid Providers, it follows that the Commission cannot impose the 9-1-1 emergency service fee on these customers because their "place of primary use" is not in Texas, or apparently anywhere else. Assuming without deciding that the wireless cards they sell constitute "telephone prepaid calling cards" within the meaning of the tax code, we disagree with the Prepaid Providers' argument for the following reasons.

### *(1) The Prepaid Providers' Argument Depends on Selective Application of Statutory Definitions*

The statute plainly states that the sourcing rules govern the sourcing of charges for "mobile telecommunications services." *Id.* § 151.061(c). Because the statute limits only the taxation of the services it covers, if, as the Prepaid Providers contend, the products they provide *do not* fall within the tax code's definition of "telecommunications services," the sourcing rules do not apply to those products at all and cannot operate to prohibit their taxation. The Prepaid Providers'

19

argument depends on their characterization of the products they provide as "telecommunications services" for one purpose (application of the sourcing rules) but not for another (designation of primary place of use). Accepting their assertion that their products are not "mobile telecommunications services" leads to the conclusion that the sourcing rules are not applicable and therefore do not prohibit a particular taxing authority from imposing taxes, fees, or charges on them.

### (2) The Prepaid Providers' Argument Would Avoid Taxation By <u>Any</u> Taxing Jurisdiction

Moreover, if the statute operated in a manner that resulted in their customers' having no "place of primary use," then *no* taxing jurisdiction would have authority to impose taxes, fees, or charges on them. Yet the Prepaid Providers insist that tax code section 151.061 and health and safety code 771.0735 together embody just such a policy decision. But if, as the Prepaid Providers contend, section 771.0735 precludes imposition of a fee under 771.0711, then it must also preclude the imposition of a fee under 771.0712. Such a result cannot be squared with the Prepaid Providers' own assertions regarding the purpose of health and safety code section 771.0712 or with that section's legislative history. It is undisputed that section 771.0712 requires sellers of prepaid wireless telecommunications services to collect a 9-1-1 emergency service fee from their customers. We decline to read the sourcing rules in a manner that eviscerates 771.0712 and so plainly contradicts the legislature's intent.

### (3) "Connection" v. "Service"

The sourcing rules apply to and regulate the taxation of mobile telecommunication *services* rather than to wireless telecommunications *connections*. *Compare* Tex. Tax Code Ann. § 771.0561(c) *with* Tex. Health & Safety Code Ann. § 771.0711(a). As stated above, the tax code

20

defines "telecommunications service" as "electronic or electrical transmission, conveyance, routing, or reception of sounds, signals, data, or information utilizing wires, cable, radio waves, microwaves, satellites, fiber optics, or any other method now in existence or that may be devised, including but not limited to long-distance telephone service." *See* Tex. Tax Code Ann. § 151.0103. Application of the sourcing rules to services, rather than connections, is consistent with the goal of avoiding multiple taxation of sound or data transmissions that frequently originate in one taxing jurisdiction, terminate in another, and pass through others along the way. By contrast, a wireless telecommunications connection is a "wireless communication station assigned a number containing an area code." *See* Tex. Health & Safety Code Ann. § 771.001(13). A connection is, by definition, fixed in one taxing jurisdiction. When there is only one potential taxing jurisdiction, sourcing rules are unnecessary and serve no purpose. The 9-1-1 emergency service fee contained in section 771.0711(a) is imposed on telecommunications *connections* rather than *services.* Thus, it appears that the sourcing rules, by their own terms, do not apply to the fee on connections imposed by section 771.0711. It is also logical to conclude that the sourcing rules do not apply to a fee on a telecommunications connection because concerns about multiple taxation are absent. In that case, the Prepaid Providers' reliance on the sourcing rules is wholly misplaced, as those rules simply have no application here.

From the foregoing, it appears sensible to conclude that the sourcing rules do not apply here. We note, however, that health and safety code section 771.0735(3) provides that "the fee imposed on wireless telecommunications bills shall be administered in accordance with Section 151.061, Tax Code," i.e., the sourcing rules. While this perplexing provision speaks to a "fee

21

imposed on wireless telecommunications bills" rather than a fee on connections or services, it could be construed as a directive that the sourcing rules be applied to the 9-1-1 emergency service fee at issue here. Alternatively, it could reasonably be construed to mean that a fee for *services* that is "imposed on a wireless telecommunications bill" is governed by the sourcing rules, but a fee for a *connection* is not. Because this issue is not directly before us, we need not decide today whether the sourcing rules apply to the 9-1-1 emergency service fee. Suffice it to say that the sourcing rules contained in section 151.061 of the tax code provide no basis for disregarding the plain statutory language imposing that fee on "each wireless telecommunications connection." *See* Tex. Health & Safety Code Ann. § 771.0711(a).

### *Threat of Double Taxation*

The Prepaid Providers next complain that interpreting the statute as urged by the Commission will result in their services being taxed twice, i.e., under both section 771.0711 and section 771.0712. Although the precise scope and effect of section 771.0712 is not before us, the Commission does not argue in this case that both taxing provisions would apply to the Prepaid Providers. The Prepaid Providers' concern arises, again, out of their assumption that section 771.0712 creates a *new* fee, when it is not at all clear that it does. The hypothetical threat of double taxation does not alter our analysis of the scope of section 771.0711.

### *Section 771.0711 Applies to <u>All</u> Wireless Telecommunications Connections*

Having considered the plain language of the statute and employed the dominant rules of statutory construction, we conclude that section 771.0711 unambiguously imposes a 9-1-1 emergency service fee on *all* wireless telecommunications connections, regardless of whether they

22

are marketed and sold using a prepaid or postpaid business model. We are not persuaded that the provisions addressing the amount of the fee and the collection procedures manifest a legislative intent that the 9-1-1 emergency service fee not apply to wireless telecommunications connections that are sold through the prepaid business model employed by the Prepaid Providers.

Even if we considered the statutory language to create an ambiguity as to that question, however, the result would be the same. When a statute is ambiguous, we must "give serious consideration" to the "[c]onstruction of [the] statute by the administrative agency charged with its enforcement," *Texas Citizens*, 2011 WL 836827, at *4, and uphold that agency's interpretation if it is reasonable and does not contradict the plain language of the statute. *See First Am. Title Ins. Co.*, 258 S.W.3d at 632. Section 711.0711(a) states that "the Commission shall impose" the 9-1-1 emergency service fee, and the Attorney General has determined that "the authority to resolve a claim about the applicability of section 771.071(a) to a wireless telecommunications connection based on the nature of the provider's service is [] clearly within the Commission's purview." *See* Op. Tex. Att'y Gen. No. GA-0401 (2006). After applying the dominant rules of statutory construction, including giving serious consideration to the Commission's reasonable interpretation, we conclude that no doubt remains about the statute's application to the wireless telecommunications connections sold by the Prepaid Providers. Accordingly, we are not authorized to use the statutory construction aid of "stricter construction" in favor of the taxpayer and against the taxing authority:

> [A]lthough we have applied a "stricter construction" to tax statutes in the past, we have done so only when "doubt about [the statute's] application remains after dominant rules of construction have been applied." One of those "dominant rules of

23

construction" requires us to give "serious consideration" to the "[c]onstruction of a statute by the administrative agency charged with its enforcement."

*First Am. Title Ins. Co.*, 258 S.W.3d at 632 (citations omitted).

Nonetheless, the Prepaid Providers contend that there are a number of "procedural errors" that vitiate the Commission's decision and preclude any deference to its decision. First, they assert that the Commission "improperly shifted the burden of proof" to the Prepaid Providers to show that section 711.0711 did not apply to them. However, the issue before the Commission was one of statutory construction, a purely legal question that does not involve evidentiary issues or burdens of proof. The Commission did not *assume* the statute's applicability and then require the Prepaid Providers to prove they were entitled to an exemption from that statute; rather, the Commission considered whether or not the Prepaid Providers' wireless telecommunications connections were subject to the 9-1-1 emergency service fee in the first instance. In reaching its conclusion regarding the proper construction of the statute, the Commission considered the Prepaid Providers' argument that their inability to comply with the assessment and collection provisions contained in the statute demonstrated that the legislature intended for the services they provided to be outside the scope of section 711.0711. But the Commission did not require the Prepaid Providers to prove that compliance was impossible in order to avoid application of the statute. The Commission's conclusion that prepaid wireless telecommunications are subject to the 9-1-1 emergency service fee in section 711.0711 resulted from its application of rules of statutory construction, not on any failure by the Prepaid Providers to provide evidence of any particular facts.

24

We also reject the Prepaid Providers' bare assertions that (1) the Commission "paid substantial and undue deference" to the positions of its staff and outside counsel, (2) the outcome of the case was "predetermined," and (3) the Commission failed to provide sufficient analysis to support its position, thereby depriving them of due process. The ALJ issued a detailed proposal for decision, and the Commission's final order adopted, with some modifications, the ALJ's findings of fact and conclusions of law. The proposal for decision and final order reflect a balanced consideration of the arguments advanced by both parties and supply sufficient analysis to support the Commission's conclusion, a conclusion that this Court too has reached after conducting a de novo review of the district court's order. Although the Prepaid Providers disagree with the result, the Commission explained the rationale for the decision it reached after providing the parties notice and an opportunity to be heard at a meaningful time and in a meaningful manner. *See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).

Finally, the Prepaid Providers assert that the Commission's decision applying section 771.0711 to the wireless telecommunications connections of their customers violates the Texas Constitution's guarantee of equal and uniform taxation, *see* Tex. Const. art. VIII, § 1, because it effectively requires them to "shoulder the burden of paying their users' e911 fee amounts because they cannot collect the fee in compliance with § 771.073(a)." Although the Prepaid Providers have argued that, because of their prepaid business model, they could not comply with the statutory provisions prescribing the manner of assessing and collecting the 9-1-1 emergency service fee, the record does not show that they were unable to collect the fee from their users. Nor did the Commission "single[] out TracFone and Virgin Mobile as the only prepaid wireless resellers subject

25

to the e911 fee during the refund period." This proceeding was initiated by the Prepaid Providers when they sought a refund of taxes they had voluntarily paid the Comptroller. The contested-case hearing arose out of the Comptroller's and the Commission's efforts to resolve the Prepaid Providers' claims for a tax refund, not out of the Comptroller's or the Commission's attempts to selectively apply or enforce a tax statute against certain providers.

For the foregoing reasons, we hold that health and safety code section 771.0711 applies to the wireless telecommunications connections the Prepaid Providers provide to their customers.

## CONCLUSION

We reverse the district court's judgment and render judgment that Texas Health and Safety Code section 771.0711 applies to the prepaid wireless telecommunications connections that TracFone and Virgin Mobile provide to their customers.

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Henson and Goodwin

Reversed and Rendered

Filed: May 5, 2011

26