# IN THE SUPREME COURT OF TEXAS

═══════════
No. 11-0473
═══════════

TRACFONE WIRELESS, INC. AND VIRGIN MOBILE USA, L.P., PETITIONERS,

v.

COMMISSION ON STATE EMERGENCY COMMUNICATIONS, RESPONDENT

═══════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS
═══════════════════════════════════════════════════

**Argued October 17, 2012**

JUSTICE WILLETT delivered the opinion of the Court.

Texas cellphone users help fund the State's 911 emergency networks via two distinct "e911 fee" statutes. The first, enacted in 1997, imposes on wireless subscribers a $0.50/month "emergency service fee"[1] collected on the customer's bill. The second, effective June 1, 2010, imposes on *prepaid* wireless subscribers a flat 2% fee,[2] collected by the retail seller when a consumer buys prepaid service. The 2010 law assesses the e911 fee on prepaid wireless customers; the question here is whether the pre-2010 law did so. We answer no.

---

[1] TEX. HEALTH & SAFETY CODE § 771.0711.

[2] Act of June 1, 2009, 81st Leg., R.S., ch. 1280, § 3.03, 2009 Tex. Gen. Laws 4032, 4045 (codified at TEX. HEALTH & SAFETY CODE § 771.0712).

In this case, the government seeks not judicial construction of a tax law[3] so much as judicial enlargement of it. We decline. Tax policy gap-filling—specifically, deciding *who* is taxed—is best left to legislators, not courts or agencies. The two e911 statutes are either ambiguous, meaning they must be construed narrowly in favor of the taxpayer, or they are unambiguous, meaning prepaid customers are impermissibly double-taxed. Either way, the original 1997 law—on the books before prepaid service was on the market—does not apply. Accordingly, we reverse the court of appeals' judgment.

## I. Background

### A. An Overview of Prepaid Wireless Service

TracFone Wireless, Inc. and Virgin Mobile U.S.A., L.P. (the Prepaid Providers) offer prepaid wireless telephone service. As the name suggests, prepaid service differs from traditional service by the manner in which customers are charged. The traditional "postpaid" arrangement involves a

---

[3] Even though the Legislature referred to the e911 charges as "fees," both parties refer to tax laws throughout their briefing. That is, the parties themselves treat the so-called "fees" as taxes. We therefore do the same. After all, the Legislature's decision to label a charge a "fee" rather than a "tax" is not binding on this Court. *See Conlen Grain & Mercantile, Inc. v. Tex. Grain Sorghum Producers Bd.*, 519 S.W.2d 620, 623 (Tex. 1975) (statutory "assessment" is really a tax); *Hurt v. Cooper*, 110 S.W.2d 896, 899–900 (Tex. 1937) (statutory "license fee" is really a tax). A charge is a fee rather than a tax when the primary purpose of the fee is to support a regulatory regime governing those who pay the fee. *Tex. Boll Weevil Eradication Found. v. Lewellen*, 952 S.W.2d 454, 461 (Tex. 1997); *Conlen Grain & Mercantile*, 519 S.W.2d at 623–24; *H. Rouw Co. v. Tex. Citrus Comm'n*, 247 S.W.2d 231, 234 (Tex. 1952); *Hurt*, 110 S.W.2d at 899–900; *City of Fort Worth v. Gulf Refining Co.*, 83 S.W.2d 610, 617–19 (Tex. 1935). Here, no regulatory regime is created that regulates the consumers of wireless services, so the e911 fee is a tax rather than a fee.

We recognize that one unpublished, non-precedential court of appeals decision treated a similar, locally-imposed e911 fee as a fee rather than a tax. *City of Plano v. Sw. Bell Mobile Sys., Inc.*, No. 11-98-00293-CV, 2000 WL 34234855, at *1–3 (Tex. App.—Eastland Jan. 6, 2000, no pet.) (not designated for publication). However, we are unpersuaded by that case's reasoning. In particular, *City of Plano* erred when it found that the e911 fee was a fee rather than a tax because the funding of an e911 system is not primarily a revenue-raising purpose. *Id.* at *2. Funding an e911 system is a revenue-raising purpose, even though the revenue is put into a special fund for e911 services rather than the general revenue. "Because money is fungible," the determination of whether something is a fee or a tax "is not controlled by whether the assessments go into a special fund or into the State's general revenue." *Tex. Boll Weevil*, 952 S.W.2d at 461. Therefore, the e911 fee is a tax, just as the parties assume.

locked-in contract between provider and customer, with the customer billed monthly. By contrast, prepaid-wireless subscribers skip the long-term contract and instead pay up front for the handset and a defined amount of service—usually a specified dollar amount or block of minutes. Unlike traditional, monthly-billed wireless users, prepaid users receive no bills, have no obligation to remain a customer, and utilize the service purchased as quickly or as slowly as they wish (if at all). Users who exhaust their prepaid airtime can purchase more on a "pay as you go" basis, but they have no ongoing contractual obligation.

### B. The Two e911 Fee Statutes for Wireless Customers

Chapter 771 of the Health and Safety Code governs the e911 fee, which has applied to wireless customers since 1997 (and landline customers for longer)[4]. The Commission on State Emergency Communications (CSEC) is charged with imposing an e911 fee on each "wireless telecommunications connection," to be collected from subscribers by the "wireless service provider."[5] "Wireless service provider" is defined as:

> a provider of commercial mobile service under Section 332(d), Federal Telecommunications Act of 1996 (47 U.S.C. Section 151 et seq.), Federal Communications Commission rules, and the Omnibus Budget Reconciliation Act of 1993 (Pub. L. No. 103-66), and includes a provider of wireless two-way communication service, radio-telephone communications related to cellular telephone service, network radio access lines or the equivalent, and personal communication service.[6]

---

[4] TEX. HEALTH & SAFETY CODE § 771.071 (e911 fee for landline customers); *id.* § 771.0711 (e911 fee for wireless customers).

[5] *Id.* § 771.0711.

[6] *Id.* § 771.001(12).

3

The original 1997 e911 fee statute for wireless subscribers is Section 771.0711(b), which specifically mandates how the fee is to be billed, collected, and remitted:

> A wireless service provider shall collect the fee in an amount equal to 50 cents a month for each wireless telecommunications connection from its subscribers and shall pay the money collected to the comptroller not later than the 30th day after the last day of the month during which the fees were collected.

The monthly $0.50 fee is collected by the wireless providers "in the same manner it collects . . . charges for service."[7]

A dozen years later, in 2009, the Legislature, responding to technological and business innovation—namely the emergence of prepaid wireless services—amended Chapter 771 to also impose a distinct e911 fee specific to prepaid subscribers. This change, effective June 1, 2010, added Section 771.0712, which assesses a 2% upfront fee to each sale of prepaid wireless service:

> To ensure that all 9-1-1 agencies . . . are adequately funded . . . a prepaid wireless 9-1-1 emergency services fee of two percent of the purchase price of each prepaid wireless telecommunications service purchased by any method, shall be collected by the seller from the consumer at the time of each retail transaction of prepaid wireless telecommunications service occurring in this state and remitted to the comptroller consistent with Chapter 151, Tax Code, and distributed consistent with the procedures in place for the emergency services fee in Section 771.0711, Health and Safety Code.[8]

### C. The Present Dispute

Between 2001 and 2005, the Prepaid Providers paid roughly $2.3 million in e911 fees under Section 771.0711, long before Section 771.0712 took effect on June 1, 2010. When the Prepaid Providers later concluded that tax-preparation errors caused them to remit millions erroneously (out

---

[7] *Id.* § 771.073(a).

[8] *Id.* § 771.0712(a).

of their own pockets, not collected from customers), they stopped paying additional fees and sought refunds of the amounts already paid. (Interestingly, nothing in the record suggests the State ever sought to enforce the e911 fee against other prepaid wireless companies or that anyone besides these two providers actually remitted fees on their customers' behalf.)

The CSEC initiated a contested case against the Prepaid Providers to determine Chapter 771's applicability to prepaid services. An administrative law judge issued a proposal for decision construing Section 771.0711 as imposing the e911 fee on prepaid wireless, but noting that (1) "prepaid cellular phone services . . . were not contemplated by the legislature in the statutory scheme"; and (2) CSEC presented no evidence that, at any time during the relevant period, it had issued a rule, opinion, or policy letter stating the e911 fee applies to prepaid wireless. CSEC adopted the ALJ's proposal for decision and denied the Prepaid Providers' motion for rehearing.

Shortly thereafter, in 2009, the Legislature enacted Section 771.0712, the e911 fee statute specific to prepaid wireless service. This new statute did not amend the original $0.50/month fee enacted in 1997. Rather, it detailed a separate calculation and collection mechanism specifically tailored for prepaid wireless: 2% of the purchase price collected by the retailer at the point of sale.

Once the new e911 fee was adopted, the Prepaid Providers sought review in the trial court, which agreed with them and ordered refunds, holding that prepaid wireless was not covered by Section 771.0711. The court of appeals reversed, concluding the Prepaid Providers were obligated

5

to collect and remit the e911 fee in the original statute.[9]  This appeal followed, posing a simple question: Does the pre-2010 statute tax prepaid service?

## II.  Discussion

The court of appeals held,[10] and CSEC argues, that the original e911 fee in Section 771.0711 unambiguously applied to prepaid wireless before June 1, 2010.  Alternatively, the court of appeals held,[11] and CSEC argues, that even if the 1997 statute is deemed ambiguous, CSEC should still prevail.

Whether the pre-2010 statute unambiguously imposed a fee on prepaid customers is not instantly clear.  On the one hand, Section 771.0711(a) seems to cover all wireless providers, including prepaid, stating broadly that "the commission shall impose on *each* wireless telecommunications connection a 9-1-1 emergency service fee."[12]  Moreover, Section 771.001(13) states, "'Wireless telecommunications connection' means *any* wireless communication mobile station assigned a number containing an area code assigned to Texas . . . ."[13]  On the other hand, the mandatory mechanics of the pre-2010 statute seem nearly impossible to apply coherently to prepaid service.  For one thing, it requires providers to collect the fee from customers on a monthly basis,[14]

---

[9] 343 S.W.3d 233.

[10] *Id.* at 235–46.

[11] *Id.* at 247–48.

[12] TEX. HEALTH & SAFETY CODE § 771.0711(a) (emphasis added).

[13] *Id.* § 771.001(13) (emphasis added).

[14] *Id.* § 771.0711(b).

even though prepaid is not sold in monthly increments, and customers use an unpredictable number of months of prepaid service. Similarly, the pre-2010 statute requires that the fee be billed "in the same manner" a service provider otherwise bills its customers,[15] even though prepaid customers are not billed on a recurring basis. These two charge-and-collection provisions are no less mandatory than the catch-all language regarding "each" wireless connection and "any" wireless station. Safe to say, there is a square-peg-round-hole mismatch between the unique characteristics of prepaid wireless and the ill-fitting billing/collection/remittance methods mandated almost 16 years ago in the original wireless e911 statute.

Section 771.0711 doubtless intended to tax all wireless service that then existed, and certainly an old statute can encompass new technologies if the statutory text is worded broadly enough, which raises the key question: What interpretive principles control our analysis of how the pre- and post-2010 fee statutes interrelate? Importantly, our result is the same whether Section 771.0711 is deemed ambiguous or unambiguous: Either way, the Prepaid Providers prevail.

### A. The Prepaid Providers Prevail if Section 771.0711 Unambiguously Applies Because That Results In Double Taxation Violating the Texas Constitution's Equal and Uniform Clause.

There are two wireless e911 fees that raise revenue for CSEC, both of them mandatory. If CSEC is correct that Section 771.0711 unambiguously applies to prepaid wireless customers—as

---

[15] *Id*. § 771.073(a). This provision was amended in 2011 to exclude the tax imposed on prepaid wireless customers through Section 771.0712, but the amendment did not affect the tax imposed through Section 771.0711. Act of June 28, 2011, 82d Leg., 1st C.S., ch. 4, § 73.04, 2011 Tex. Gen. Laws 5254, 5348 (codified at TEX. HEALTH & SAFETY CODE § 771.073(a)).

Section 771.0712 unquestionably does—that would result in impermissible double taxation that offends the Equal and Uniform Clause.[16]

The parties both assume the law forbids double taxation, but neither side explains *why* that is so. It is true that no Texas constitutional provision explicitly discusses double taxation. But for at least 125 years, we have assumed and sometimes held that double taxation is forbidden. A careful examination of this precedent reveals that certain kinds of double taxation are indeed unconstitutional.

Admittedly, our double-taxation jurisprudence has not been a model of clarity. A case from 1868 held the Legislature could impose two $300 taxes on the exact same people (liquor retailers), payable to two different jurisdictions. We held this imposition of two $300 taxes was essentially the same as imposing one $600 tax.[17] However, in 1888, we stated in dicta that double taxation, "if permissible, will not be presumed to have been intended, in the absence of a law that will not bear any other reasonable construction," so any tax on real property assessed against a lessee should be treated as a credit against the property owner's property tax.[18] In 1901, we plainly held that double taxation "is not permitted," so a tax on tangible property could not be assessed against a company that already included the value of this property in its franchise tax assessment.[19] In 1948, we refused the writ of error in a case concluding that double taxation is "economically unsound, and we believe

---

[16] TEX. CONST. art. VIII, § 1(a).

[17] *Napier v. Hodges*, 31 Tex. 287, 294–96 (Tex. 1868).

[18] *Daugherty v. Thompson*, 9 S.W. 99, 101 (Tex. 1888).

[19] *State v. Austin & N.W. R.R. Co.*, 62 S.W. 1050, 1051 (Tex. 1901).

unauthorized by law" and that "[a] construction that authorizes double taxation should not be adopted unless the language used admits of no other construction."[20]

Often, we have assumed that double taxation is unlawful but found that no double taxation occurred in the particular case. For example, in 1906 we held that assessing both a property tax and a use tax against one corporation was permitted under our double-taxation jurisprudence because the taxes were on different things, but we did not question the assumption that double taxation would be unlawful.[21] Later, we adopted the judgment of a 1921 Commission of Appeals decision that similarly assumed that double taxation was problematic and read double taxation out of a statute by finding a "clerical error" in the statute.[22] A 1932 writ-refused case also assumed that double taxation would be disallowed, but found no prohibited double taxation because two different entities with different purposes imposed the two taxes.[23] We similarly held in 1946 that there was no double taxation when two taxes were imposed by two different jurisdictions.[24] More recently, in 2005, a taxing district possibly required double appraisal of certain property for a property tax.[25] Although

---

[20] *Big Lake Oil Co. v. Reagan Cnty.*, 217 S.W.2d 171, 174 (Tex. Civ. App.—El Paso 1948, writ ref'd).

[21] *State v. Galveston, H. & S. A. Ry. Co.*, 97 S.W. 71, 73, 76–77 (Tex. 1906), *rev'd on other grounds*, 210 U.S. 217 (1908).

[22] *Druesdow v. Baker*, 229 S.W. 493, 496–97 (Tex. Comm'n App. 1921, judgm't adopted), *aff'd*, 263 U.S. 137 (1923).

[23] *Kuhlmann v. Drainage Dist. No. 12 of Harris Cnty.*, 51 S.W.2d 784, 788 (Tex. Civ. App.—Galveston 1932, writ ref'd).

[24] *City of Pelly v. Harris Cnty. Water Control & Improvement Dist. No. 7*, 198 S.W.2d 450, 454 (Tex. 1946).

[25] *Matagorda Cnty. Appraisal Dist. v. Coastal Liquids Partners*, 165 S.W.3d 329, 334 (Tex. 2005). We also noted that sometimes it is impossible to prevent some overlap in taxation if the Legislature wants to ensure that every piece of property is appraised and taxed. *Id*. at 334–36.

we assumed that double taxation would be impermissible, we held that double taxation had not been proven.

Therefore, for 125 years (since 1888), we have at minimum assumed that double taxation is impermissible; double taxation has been held to be impermissible at least twice;[26] but we have never explained why double taxation is impermissible. Other states have done so, however, and we generally agree with their reasoning. In short, the problem is not so much that two taxes are assessed; the problem is that the double-tax burden is imposed on some taxpayers but not on others. This unequal imposition is what offends common constitutional requirements of uniformity. Specifically, this unevenness violates the Equal and Uniform Clause of the Texas Constitution, just as double taxation in other states has been held to violate the uniformity provisions of the Kentucky,[27] Michigan,[28] New Mexico,[29] and Oklahoma[30] constitutions. The Kentucky Court of Appeals (then the highest court of Kentucky) stated succinctly the rationale for forbidding double taxation:

> In the present Constitution there is a declaration that taxation must be uniform, but no direct prohibition against double taxation. But a prohibition against double taxation was hardly necessary, because there cannot be such a thing as double taxation where the taxation is uniform. "Double taxation" means taxing twice, for the same purpose, in the same year, some of the property in the territory in which the

---

[26] *Big Lake Oil Co.*, 217 S.W.2d at 174; *Austin & N.W. R.R. Co.*, 62 S.W. at 1051.

[27] *City of Lexington v. Motel Developers, Inc.*, 465 S.W.2d 253, 256–57 (Ky. 1971); *Campbell Cnty. v. City of Newport*, 193 S.W. 1, 5–6 (Ky. 1917).

[28] *C.F. Smith Co. v. Fitzgerald*, 259 N.W. 352, 361 (Mich. 1935).

[29] *State ex. rel. Atty. Gen. v. Tittmann*, 75 P.2d 701, 703 (N.M. 1938).

[30] *Olson v. Okla. Tax Comm'n*, 180 P.2d 622, 625 (Okla.1947).

10

tax is laid without taxing all of it. If all the property in the territory upon which the tax is imposed is taxed twice and for the same purpose and in the same year without discrimination or exemption, this is not double taxation in the sense that such taxation is prohibited, because, within constitutional limits, if the tax is uniform, the amount of it is in the discretion of the taxing authorities and it may all be levied at one time, or it may be the subject of several levies.[31]

This explanation of double taxation is consistent with our 1868 case that permitted a form of double taxation; there, the two $300 taxes were imposed on all liquor stores equally, so it was deemed a single $600 tax rather than double taxation in the constitutionally prohibited sense (i.e., unequal imposition).[32] We also note that the Attorney General has stated in several opinions that the double-taxation prohibition is rooted in the Equal and Uniform Clause.[33]

Turning to the two taxes here, CSEC contends that Section 771.0711 plainly assesses $0.50/month on prepaid customers (in addition to postpaid customers). But Section 771.0712 explicitly imposes a flat 2% fee on prepaid customers (but not postpaid customers). Thus, under CSEC's argument, Sections 771.0711 and 771.0712 impose two separate e911 fees on prepaid customers but not on postpaid customers, a construction that would require impermissible double taxation.

As discussed above, the double-taxation prohibition flows from our Equal and Uniform Clause. At least where non-property taxes are concerned, the Equal and Uniform Clause generally

---

[31] *City of Newport*, 193 S.W. at 5; *see also Motel Developers*, 465 S.W.2d at 256–57 (reaffirming and quoting *City of Newport*).

[32] *See Napier*, 31 Tex. at 294–96.

[33] Op. Tex. Att'y Gen. No. JC-0150 (1999); Tex. Att'y Gen. Op. No. JM-930 (1988); *see also* Op. Tex. Att'y Gen. Op. No. WW-431 (1958) (double-taxation prohibition is based on article VIII, section 1 of the Constitution, of which Equal and Uniform Clause is a part); *cf.* Op. Tex. Att'y Gen. Op. No. M-241 ("[A] construction of a statute authorizing double taxation should not be adopted unless the language used admits of no other construction.").

only prohibits unequal or multiform taxes that are imposed on members of the same class of taxpayers.[34] However, the Legislature's decision to treat different classes in different ways must still be related to the purpose of the tax.[35]

CSEC has not argued that the Legislature intended prepaid and postpaid customers to be members of two separate classifications. Moreover, even if they *were* different classes of taxpayers, CSEC has not and probably cannot argue that the Legislature's imposition of significantly more tax on prepaid customers than on postpaid customers furthers the purpose of the e911 fee. The purpose of the tax seems to be to tax phone customers roughly in proportion to their use of the phones, but imposing the tax twice on prepaid customers would impose a disproportionate tax for no apparent reason. Therefore, at least in this case, we find that double taxation is impermissible.

CSEC denies the double-taxation charge, but its arguments are unpersuasive. First, CSEC argues that section 771.0712 essentially preempts and implicitly repeals Section 771.0711 as to prepaid providers because of the statutory-construction canon that a specific statutory provision prevails over a general one. But the specific-over-general canon applies only when two statutory provisions are irreconcilable.[36] For example, in *Auld* (the only case CSEC cites that applies this canon), one statute *required* the award of prejudgment interest in wrongful-death suits while another statute unambiguously *prohibited* prejudgment interest in certain healthcare liability wrongful-death

---

[34] *See In re Nestle USA, Inc.*, 387 S.W.3d 610, 618–21 (Tex. 2012).

[35] *See id.* at 621–24.

[36] Tex. Gov't Code § 311.026 (statutory codification of canon). *See also Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 901 (Tex. 2000) (applying specific-over-general canon only to provisions of the statute that *expressly* conflict by "harmoniz[ing]" the statutory provisions as much as possible).

suits.[37]  Because the literal terms of both statutes could not both be true (prejudgment interest could not be required in all cases but limited to zero in some cases), the Court applied the specific-over-general canon.[38]  In today's case, unlike in *Auld*, Sections 771.0711 and 771.0712 are not irreconcilable as to prepaid customers.  By their literal terms, both of the fees could apply; they would just result in illegal double taxation.

Second, CSEC argues that, while the pre-2010 statute covered prepaid wireless, only the newer statute now does, and courts owe deference to that determination.  Specifically, CSEC notes that Comptroller rules have clarified that prepaid customers are now subject only to Section 771.0712's one-time 2% fee, not Section 771.0711's monthly $0.50 fee, so there is no illegal double taxation.  This argument stumbles at the outset.  Yes, courts sometimes defer to agencies' statutory interpretations, but only when a statute is ambiguous,[39] and here, CSEC insists the statute is *not* ambiguous.  Agency deference has no place when statutes are unambiguous—the law means what it says—meaning we will not credit a contrary agency interpretation that departs from the clear meaning of the statutory language.

As double taxation is forbidden by the Equal and Uniform Clause, either Section 771.0711 or Section 771.0712 cannot apply to prepaid wireless.  Section 771.0712 would be utterly meaningless if it did not apply, meaning we must construe Section 771.0711 as inapplicable.[40]  And

---

[37] *Auld*, 34 S.W.3d at 901.

[38] *Id.*

[39] *R.R. Comm'n of Tex. v. Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 625 (Tex. 2011).

[40] *See* TEX. GOV'T CODE § 311.021(2) ("In enacting a statute, it is presumed that . . . the entire statute is intended to be effective . . . .").

13

if Section 771.0711 does not apply to prepaid service today, then it never applied because it has never been repealed as to such service.

## B. The Prepaid Providers Prevail if Section 771.0711 Is Ambiguous Because the Presumption Favoring Taxpayers Then Applies.

We have consistently applied an ancient pro-taxpayer presumption: The reach of an ambiguous tax statute must be construed "strictly against the taxing authority and liberally for the taxpayer."[41] In other words, a tax must apply unequivocally. This presumption arises from an old English rule that "the sovereign is bound to express its intention to tax in clear and unambiguous language."[42] We have even applied this presumption in reviewing a formal administrative adjudication that found against a taxpayer.[43]

Nonetheless, CSEC urges that this presumption is trumped by two contrary canons of statutory construction. First, CSEC argues that we should defer to CSEC's own formal administrative adjudication. However, as just mentioned, we have applied the presumption favoring taxpayers even after a formal administrative ruling found taxpayer liability.[44] Further, one reason for the presumption is that taxpayers should be given notice of their tax obligations before the State

---

[41] *Morris v. Houston Indep. Sch. Dist.*, 388 S.W.3d 310, 313 (Tex. 2012) (per curiam); *see also Wilson Commc'ns, Inc. v. Calvert*, 450 S.W.2d 842, 844 (Tex. 1970); *Tex. Unemployment Comp. Comm'n v. Bass*, 151 S.W.2d 567, 570 (Tex. 1941).

[42] *Eidman v. Martinez*, 184 U.S. 578, 583 (1902).

[43] *Bullock v. Statistical Tabulating Corp.*, 549 S.W.2d 166, 169 (Tex. 1977).

[44] *Id.*

14

imposes them.[45]  We acknowledge that deference to the regulations or interpretations of an agency

charged with enforcing a tax has its place—for example when a tax unarguably applies and the court

is weighing competing interpretations of the amount owed.[46]  However, agency deference does not

displace strict construction when the dispute is not over how much tax is due but, more

fundamentally, whether the tax applies at all.  The situation here involves CSEC's post hoc formal

adjudication that the Prepaid Providers were subject to the pre-2010 e911 fee.  Such after-the-fact

decisions cannot trump the presumption in favor of taxpayers because such decisions deny taxpayers

the necessary notice of what tax is due and how it must be paid *before* imposing the obligation.  If

we found that post hoc adjudications were enough to overcome the presumption when a statute is

ambiguous, the presumption would lose all its teeth; an agency could skirt the presumption by simply

obtaining a favorable agency adjudication before a lawsuit.

Moreover, even if we indulged CSEC's invitation to flip the pro-taxpayer presumption on

its head by deferring to the taxing authority on the reach of an ambiguous tax, the authority's

interpretation must be reasonable.[47]  We are unconvinced that CSEC's interpretation of Section

771.0711 is reasonable.  For one thing, it fails to explain how the Prepaid Providers and customers

were supposed to comply with the statute's mandatory calculation and collection procedure. Simply

saying that providers might invent various ways to comply is not enough.  Tax policy is innately

---

[45] *See Eidman*, 184 U.S. at 583 ("[T]he sovereign is bound to express its intention to tax in clear and unambiguous language.").

[46] *First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 631–32 (Tex. 2008) (applying agency deference when reviewing the amount of a tax owed).

[47] *Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d at 625.

15

confiscatory and carries steep noncompliance penalties, so policymakers must actually—not abstractly—instruct taxpayers how they are expected to comply. Here, the dispute is even more fundamental—not over the *amount* of a tax, but whether a tax *applies at all*. Government overreaching imperils liberty, and in Texas, citizens must have clear notice that they are subject to a tax.

CSEC's second argument against the presumption favoring taxpayers is that the Prepaid Providers are essentially claiming an exemption from the tax. When a tax exemption is claimed, there is a contrary presumption favoring the taxing entity rather than the taxpayer.[48] However, the heart of the Prepaid Providers' claim is that they are excluded from the tax in the first instance, not that they are entitled to an exemption from a tax that would otherwise cover them. The Prepaid Providers are claiming an exclusion rather than an exemption, making the presumption favoring the government inapplicable.[49]

### III. Conclusion

Judicial construction of tax statutes eschews fuzzy math. Legislators must speak clearly, agencies heed assiduously, and courts review exactingly. Several cardinal, century-old principles dictate strictness in tax matters: (1) tax authorities cannot collect something that the law has not actually imposed; (2) imprecise statutes must be interpreted "most strongly against the government,

---

[48] *Bullock v. Nat'l Bancshares Corp. of Tex.*, 584 S.W.2d 268, 271–72 (Tex. 1979).

[49] *Bass*, 151 S.W.2d at 570 (presumption in taxpayer's favor applies if it is "a case involving the question as to whether or not the tax is levied in the first instance" rather than whether there is a tax exemption); *see also Wilson Commc'ns*, 450 S.W.2d at 844 (presumption in taxpayer's favor applies if question is about preliminary "reach" of taxing statute).

16

and in favor of the citizen"[50]; and (3) we will not extend the reach of an ambiguous tax by implication, nor permit tax collectors to stretch the scope of taxation beyond its clear bounds.

As the communications marketplace inexorably evolves—landline to wireless; postpaid to prepaid—gaps in the legal landscape will need incremental filling. Payment practices evolve, meaning tax fee structures predicated on once-upon-a-time practices must evolve, too. In 2009 the Legislature enacted a new fee for a new practice. Believing that everyone with access to the 911 system should share in its cost, lawmakers enacted a prepaid-specific e911 fee (in Section 771.0712) distinct from the postpaid wireless e911 fee (in Section 771.0711) and the landline e911 fee (in Section 771.071). Because prepaid wireless is unique, the prepaid-tailored statute is unique—in how the fee is calculated, how it is collected, and how it is remitted. In short, it imposes a new fee, not merely a new way to collect the old fee. Texas law now imposes the e911 fee on all cellphone service, both prepaid and postpaid, but the pre-2010 enactment did not. The $0.50/month fee imposed since 1997 by Section 771.0711 does not reach prepaid wireless, unlike the 2% fee imposed since 2010 by Section 771.0712.

---

[50] *Gould v. Gould*, 245 U.S. 151, 153 (1917).

Rather than stretch Section 771.0711 beyond its textual reach, we reverse the court of appeals' judgment and render judgment that the pre-2010 statute imposed no e911 fee on the Prepaid Providers' wireless services.

_____
Don R. Willett
Justice

**OPINION DELIVERED:** April 5, 2013