

## Fourth Court of Appeals
### San Antonio, Texas

### OPINION

No. 04-22-00524-CV

**ROCKSPRINGS VAL VERDE WIND, LLC**,
Appellant

v.

Jackie **CASANOVA**, RPA, CCA, in her capacity as the Chief Appraiser of the Val Verde
County Appraisal District,
Appellee

From the 63rd Judicial District Court, Val Verde County, Texas
Trial Court No. 34133
Honorable Roland Andrade, Judge Presiding

Opinion by:    Irene Rios, Justice

Sitting:        Irene Rios, Justice
                Liza A. Rodriguez, Justice
                Lori I. Valenzuela, Justice

Delivered and Filed: December 31, 2024

REVERSED AND REMANDED

This is a case of first impression concerning the ad valorem tax valuation of an operational utility-scale wind farm consisting of several wind turbine generators. Appellant Rocksprings Val Verde Wind, LLC ("Rocksprings") argues the trial court erroneously admitted irrelevant, unreliable expert testimony from the appellee's expert witness. Rocksprings contends the jury relied on this improperly admitted expert testimony that wrongfully included nontaxable,

intangible personal property in the expert's valuation. We agree. In light of our holding, we reverse and remand the cause for a new trial to determine the 2018 ad valorem tax valuation of Rocksprings that does not include nontaxable, intangible personal property.

## BACKGROUND

### A. *The Subject Property and Appraisal Process*

Rocksprings owns a wind farm consisting of several wind turbine generators in Val Verde County, Texas. The wind farm began operations in September 2017. In May of 2018, Rocksprings received a notice of appraised value in the amount of $176,454,480 from the Val Verde County Appraisal District (the "Val Verde CAD"). After receiving the notice of appraised value, Rocksprings filed a protest. Rocksprings and the Val Verde County appraisal review board met regarding the protest. At the conclusion of the protest hearing, the appraisal review board reduced Rocksprings's appraised value to $101,400,000. Appellee Jackie Casanova, RPA, CCA, in her capacity as the Chief Appraiser of the Val Verde CAD,[1] however, filed a petition for review against Rocksprings in the district court to appeal the Val Verde County appraisal review board's determination. *See* TEX. TAX CODE ANN. §§ 42.02; 42.21.

### B. *Pretrial Motions to Exclude Expert Testimony*

Both parties retained appraisal experts to determine the taxable value of Rocksprings. The Val Verde CAD retained P. Barton DeLacy and Stacy W. Jackson (collectively "DeLacy") and Rocksprings retained Paul Grafe.

Both Rocksprings and the Val Verde CAD filed pretrial motions lodging *Daubert/Robinson* challenges to the opposing party's expert testimony on valuation. *See Daubert*

---

[1] Jackie Casanova, RPA, CCA, in her capacity as the Chief Appraiser of the Val Verde CAD, is the successor to Cherry T. Sheedy, who originally brought suit in her capacity as the Chief Appraiser of the Val Verde CAD against Rocksprings. Casanova and the Val Verde CAD will collectively be referred to as "the Val Verde CAD" in the remainder of this opinion.

*v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993); *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 556 (Tex. 1995). Following a *Daubert* hearing on the parties' motions, the trial court found DeLacy's and Grafe's opinions to be relevant and reliable and denied both motions challenging the opposing parties' experts.

### C. Trial Proceedings

During the jury trial, the jury heard testimony regarding values from various sources including Rocksprings's 2017 audited financial statements, an investment portfolio created by an outside accounting firm, the initial Val Verde CAD tax appraisal forwarded to Rocksprings prior to its protest, and the new appraised value following Rocksprings's protest. Both parties then presented extensive testimony from their experts explaining their respective valuation process and final valuations of Rocksprings. The Val Verde CAD's expert, DeLacy, opined Rocksprings's 2018 final tax valuation was $200,000,000, while Rocksprings's expert, Grafe, opined Rocksprings's 2018 final tax valuation was $67,500,000.

The jury returned its verdict finding Rocksprings's 2018 ad valorem tax value was $197,417,993. Rocksprings appeals.

### LEGAL FRAMEWORK OF AD VALOREM TAXATION IN TEXAS

Article VIII, section 1(b) of the Texas Constitution provides that "[a]ll real property and tangible personal property in this State . . . shall be taxed in proportion to its value." TEX. CONST. art. VIII, § 1(b). This taxation "shall be equal and uniform." TEX. CONST. art. VIII, § 1(a). The Texas Tax Code implements these constitutional commands and provides that "[a]ll real and tangible personal property that this state has jurisdiction to tax is taxable unless exempt by law." TEX. TAX CODE ANN. § 11.01(a). However, the tax code also provides that except in circumstances not applicable to this appeal, "intangible personal property is not taxable." *Id.* § 11.02(a).

"Real property," as defined by the Texas Tax Code, means: "(A) land; (B) an improvement; (C) a mine or quarry; (D) a mineral in place; (E) standing timber; or (F) an estate or interest . . . in a property enumerated in Paragraphs (A) through (E) of this subdivision." *Id*. § 1.04(2). "Tangible personal property" means "personal property that can be seen, weighed, measured, felt, or otherwise perceived by the senses, but does not include a document or other perceptible object that constitutes evidence of a valuable interest, claim, or right and has negligible or no intrinsic value." *Id*. § 1.04(5). "Intangible personal property," on the other hand, means "a claim, interest (other than an interest in tangible property), right, or other thing that has value but cannot be seen, felt, weighed, measured, or otherwise perceived by the senses, although its existence may be evidenced by a document." *Id.* § 1.04(6). Further, the tax code provides that intangible personal property includes: "a stock, bond, note or account receivable, franchise, license or permit, demand or time deposit, certificate of deposit, share account, share certificate account, share deposit account, insurance policy, annuity, pension, cause of action, contract, and goodwill." *Id.*

The Texas Constitution also mandates that no property in this state shall be assessed for ad valorem taxes at a greater value than its fair cash market value. *See* TEX. CONST. art. VIII, § 20. "Market value" means the price at which a property would transfer for cash or its equivalent under prevailing market conditions if (a) exposed for sale in the open market with a reasonable time for the seller to find a purchaser; (b) both the seller and the purchaser know of all the uses and purposes to which the property is adapted and for which it is capable of being used and of the enforceable restrictions on its use; and (c) both the seller and purchaser seek to maximize their gains and neither is in a position to take advantage of the exigencies of the other. TEX. TAX CODE ANN. § 1.04(7).

The market value of the property shall be determined by applying generally accepted appraisal methods and techniques and by using the same or similar methods and techniques in

appraising the same or similar kinds of property. *See id.* § 23.01(b); *Aspenwood Apts. Partners, L.P. v. Harris Cnty. Appraisal Dist.*, No. 01-20-00335-CV, 2022 WL 1249956, at *9 (Tex. App.—Houston [1st Dist.] Apr. 28, 2022, no pet.) (mem. op.); *see also* TEX. TAX CODE ANN. § 23.01(a) (emphasis added) ("[A]ll *taxable* property is appraised at its market value[.]"). The three accepted methods of determining the market value of property are (1) the market data comparison method, (2) the income method (the "income approach"), and (3) the cost method (the "cost approach"). *See EXLP Leasing, LLC v. Galveston Cent. Appraisal Dist.*, 554 S.W.3d 572, 577 (Tex. 2018) (citing TEX. TAX CODE ANN. §§ 23.011, .012, .013); *see also* TEX. TAX CODE ANN. § 23.0101 (providing the taxing entity determines market value of property by considering "the cost, income, and market data comparison methods of appraisal and use[s] the most appropriate method"). Each property should be appraised based on the individual characteristics that affect the property's market value. *See Matagorda Cnty. Appraisal Dist. V. Coastal Liquids Partners, L.P.*, 165 S.W.3d 329, 334 (Tex. 2005).

Finally, we note the Texas Supreme Court consistently has applied a pro-taxpayer presumption by construing ambiguous tax statutes "strictly against the taxing authority and liberally for the taxpayer." *TracFone Wireless, Inc. v. Comm'n on State Emergency Commc'ns*, 397 S.W.3d 173, 182 (Tex. 2013) (quoting *Morris v. Houston Indep. Sch. Dist.*, 388 S.W.3d 310, 313 (Tex. 2012)). In directing that "a tax must apply unequivocally," the court has referred to the "old English rule that 'the sovereign is bound to express its intention to tax in clear and unambiguous language.'" *TracFone*, 397 S.W.3d at 182 (quoting *Eidman v. Martinez*, 184 U.S. 578, 583 (1902)).

**PRODUCTION TAX CREDITS AND PRIVATE PURCHASE AGREEMENTS**

*A. Production Tax Credits*

Wind farm projects are expensive to develop and do not generate enough income from the sale of electricity to provide an acceptable return for investors. Thus, to promote investment in renewable energy, the federal government provides production tax credits ("PTCs") to investors who own or invest in renewable energy projects, like wind farms. A PTC is a nonrefundable inflation-adjusted, per-kilowatt-hour tax credit for electricity generated by a qualified renewable energy resource. *See* 26 U.S.C.A. § 45. And because wind farms do not generate sufficient income for the owners to fully benefit from PTCs, the federal government allows wind farm owners to sell PTCs to third parties who can take advantage of the tax credits to reduce their income tax liability.

In this case, Rocksprings sold ninety-nine percent of its PTCs to EFS Renewables Holdings, LLC, New York Life Insurance Company, and New York Life Insurance and Annuity Corporation. These tax equity investors paid Rocksprings $162,500,000 in exchange for the PTCs, which, if utilized, reduce the tax equity investors' income tax liability dollar-for-dollar. Rocksprings, in turn, used the investment proceeds to pay down its construction loans on the wind farm.

Val Verde Wind Holdco, LLC, the only cash equity investor and party eligible to receive a direct return on its investment through revenue generated by the sale of electricity produced by Rocksprings, received the remaining one percent of the PTCs. Those owning PTCs must utilize the credits within ten years from the date the wind farm is placed into service; otherwise, the credits are lost.

*B. Private Purchase Agreements*

To provide additional security to investors, renewable energy projects utilize power purchase agreements ("PPAs") to provide predictable revenue streams rather than selling the generated power at unpredictable market rates. A PPA is usually a long-term contract between the seller of wind energy and the purchaser to buy power generated by a wind farm at a fixed price regardless of the fluctuations of the open market. PPAs convey no ownership interest, either cash equity or tax equity, in the wind farms themselves.

Here, Rocksprings is a party to two short-term PPAs, one with Wal-Mart Stores, Inc. ("Wal-Mart"), and the other with 3M Company ("3M"). At the time the PPAs were executed, the power to be sold pursuant to the PPAs was considered above-market value because the negotiated prices to be paid to Rocksprings exceeded the then-current market price for electricity by fifteen to twenty percent. Nevertheless, dependent upon the fluctuating market, the negotiated fixed price of PPAs sometimes exceeds the market, while at other times, the rates may be less than the current market rates. Through the PPAs, Wal-Mart and 3M collectively purchased ninety percent of the power produced by Rocksprings; the remaining ten percent is sold on a merchant basis at market prices.

**ISSUES RAISED ON APPEAL**

Rocksprings raises two issues on appeal. In its first issue, Rocksprings argues DeLacy provided "irrelevant, unreliable expert testimony" that should have been struck because DeLacy wrongfully included values associated with PTCs and PPAs in his ad valorem valuation. Rocksprings contends both PTCs and PPAs are nontaxable, intangible personal property. Rocksprings asserts in its second issue that, absent DeLacy's testimony, no evidence supports the jury's verdict.

**ADMISSIBILITY OF EXPERT TESTIMONY AND STANDARDS OF REVIEW**

An expert witness may testify regarding scientific, technical, or other specialized matters if the expert is qualified and if the expert's opinion is relevant, reliable, and based on a reliable foundation. *See* TEX. R. EVID. 702; *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 637 (Tex. 2009); *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 578 (Tex. 2006); *Robinson*, 923 S.W.2d at 556. Appraisal expertise is a form of "specialized knowledge used to assist the trier of fact to determine a fact in issue." *Guadalupe-Blanco River Auth. v. Kraft*, 77 S.W.3d 805, 807 (Tex. 2002) (alterations omitted) (citing TEX. R. EVID. 702); *Harris Cnty. Appraisal Dist. v. Kempwood Plaza Ltd.*, 186 S.W.3d 155, 157 (Tex. App.—Houston [1st Dist.] 2006, no pet.). Expert appraisals are therefore subject to relevance and reliability requirements. *Kempwood Plaza*, 186 S.W.3d at 158 (citing *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 718–19 (Tex. 1998)).

To be relevant, an expert's opinion must be based on the facts; to be reliable, the opinion must be based on sound reasoning and methodology. *See State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009); *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 629 (Tex. 2002). Conclusory or speculative expert opinion testimony is not relevant because it does not tend to make the existence of material facts more probable or less probable. *See Whirlpool*, 298 S.W.3d at 637; *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex. 2004). Expert testimony that is based on unreliable data or flawed methodology is unreliable and does not satisfy the relevancy requirement. *See TXI Transp. Co. v. Hughes*, 306 S.W.3d 230, 234 (Tex. 2010); *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 714 (Tex. 1997). Further, expert testimony is unreliable if "'there is simply too great an analytical gap between the data and the opinion proffered.'" *Gammill*, 972 S.W.2d at 727 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Unreliable expert testimony is legally no evidence. *See Havner*, 953 S.W.2d at 714;

*Weingarten Realty Investors v. Harris Cnty. Appraisal Dist.*, 93 S.W.3d 280, 285 (Tex. App.—Houston [14th Dist.] 2002, no pet.).

Courts are to rigorously examine the validity of facts and assumptions on which an expert's testimony is based, as well as the principles, research, and methodology underlying the expert's conclusions and the manner the expert applies the principles and methodologies to reach the conclusions. *See Whirlpool*, 298 S.W.3d at 637; *Zwahr*, 88 S.W.3d at 629. An expert's conclusion might be unreliable, for example, if it is based on assumed facts rather than actual facts. *See Whirlpool*, 298 S.W.3d at 637; *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995). In addition, an expert's opinion might be conclusory if it is based on tests or data that do not support the conclusion reached. *See Whirlpool*, 298 S.W.3d at 637; *City of San Antonio v. Pollock*, 284 S.W.3d 809, 818 (Tex. 2009). Furthermore, each material part of an expert's theory must be reliable. *See Whirlpool*, 298 S.W.3d at 637; *Wilson v. Shanti*, 333 S.W.3d 909, 913 (Tex. App.—Houston [1st Dist.] 2011, pet. denied). Thus, "'the expert's testimony must be reliable at each and every step or else it is inadmissible.'" *Wilson*, 333 S.W.3d at 913 (quoting *Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 355 (5th Cir. 2007)).

Once a party objects to proffered expert testimony, the proponent of the expert testimony bears the burden of demonstrating its admissibility. *See Robinson*, 923 S.W.2d at 557; *U.S. Renal Care, Inc. v. Jaafar*, 345 S.W.3d 600, 607 (Tex. App.—San Antonio 2011, pet. denied). The trial court's gatekeeping function under Rule 702 does not supplant cross-examination as the traditional means of attacking shaky but admissible evidence. *See Gammill*, 972 S.W.2d at 728. But neither does the availability of cross-examination relieve the trial court of its threshold responsibility under Rule 702 to ensure that an expert's testimony rests on a reliable foundation and is relevant. *See id.*

Generally, rulings regarding the admissibility of evidence, including whether expert testimony is reliable, are reviewed for an abuse of discretion. *See Whirlpool*, 298 S.W.3d at 638. However, as Rocksprings does in this case, a party may assert on appeal that unreliable expert testimony is not only inadmissible but also legally insufficient to support a verdict. *See id*. While we review evidentiary rulings for an abuse of discretion, in a no-evidence review, we independently consider whether the evidence at trial would enable reasonable and fair-minded jurors to reach the verdict. *See id*.; *see also City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). Further, a no-evidence review encompasses the entire record, including contrary evidence tending to show the expert's opinion is incompetent or unreliable. *See Whirlpool*, 298 S.W.3d at 638; *City of Keller*, 168 S.W.3d at 813.

### DISCUSSION OF THE EXPERT TESTIMONY

In this case, most of the facts relevant to our review are undisputed. The outcome of this case turns entirely on whether PTCs and PPAs are considered intangible, personal property and thus should be excluded from Rocksprings's 2018 ad valorem tax valuation.

### A. *DeLacy's Approach to Valuation of Rocksprings*

The Val Verde CAD's expert, DeLacy, is a real estate appraiser specializing in valuating renewable or green energy projects. DeLacy explained he has valuated wind farms for private companies and other counties outside Texas. Between 2008 and 2021, DeLacy had valuated about twenty-five wind farms. DeLacy has also written several articles and made presentations regarding the valuation of wind farms for purposes of ad valorem taxation: one of his articles was peer reviewed and many have been printed in various appraisal journals and magazines.

Concerning the 2018 ad valorem tax valuation of Rocksprings, DeLacy prepared a written appraisal report that analyzed the valuation two different ways: through a cost approach and an income approach.

DeLacy explained the cost approach as the traditional way of valuating special-purpose property: "the appraiser decides what the replacement cost of the project would be today" taking into consideration deductions for wear and tear and adjustments for external or economic obsolescence. Explaining his methodology of performing his cost analysis, DeLacy described the various assets of Rocksprings, including the wind turbines, permits, grants, and the operating systems used to direct the computers. DeLacy also gave examples of everything necessary to successfully build a wind farm, including, but not limited to, broker fees, developer fees, and insurance. When valuating the PTCs and PPAs, however, DeLacy explained they are "inextricably intertwined" with the property's valuation and must be considered to accurately valuate an operable wind farm. Using the cost approach, DeLacy concluded Rocksprings had an ad valorem taxable valuation of $224,000,000 in 2018.

When performing his income approach, DeLacy stated that the approach "in its simplest form values a future stream of benefits" and tries to reflect what the market would pay on that date. Thus, the income approach starts by looking at income, expenses, and then applies a discount rate, which is used to determine the present value of future cash flow. DeLacy explained Rocksprings's sources of income or revenue derived from: (1) the two PPAs with 3M and Wal-Mart, accounting for ninety percent of the power Rocksprings sold; (2) the remaining ten percent of the power sold at market price through ERCOT; and (3) the PTCs, which are contingent upon Rocksprings generating power over the course of time. DeLacy considers both PPAs and PTCs as income to

wind farm producers because if valuating a wind farm by the income approach, all income or revenue tied to the generation of wind should be included.

While DeLacy admitted PTCs and PPAs are intangible assets, DeLacy stated, "I don't think you can do an income approach without considering intangibles. Arguably every component of the income approach is an intangible of some sort." DeLacy acknowledged that while taxing jurisdictions vary on their approach to PPAs, they should nevertheless be included in the valuation here because they are "so integral and integrated with the wind farm itself, to value the wind farm with an income approach" all sources of income must be considered. DeLacy testified, "[T]he income approach itself is all about intangibles, and so where do you draw the line? It's kind of a semantic difference, and that may be a question of law here in Texas[,] [b]ut for doing a market valuation, . . . the discounted cash flow analysis is the best tool to value the wind farm, and that's how a market participant would look at it, and that's what we do as appraisers[:] [w]e look at market value." After adding the revenue numbers, subtracting expenses, and dividing by the discount rate, DeLacy stated he valuated Rocksprings under the income approach for January 1, 2018, at $197,400,000.

DeLacy then reconciled the difference between the cost approach at $224,000,000, and the income approach at $197,400,000, placing more weight on the income approach, and arrived at his final 2018 ad valorem tax valuation for Rocksprings at $200,000,000. DeLacy testified that his valuation provides the value at which a buyer would pay for Rocksprings's "entire business enterprise" on the open market and conceded "the fee simple interest [he] appraised included intangible property peculiar to [Rocksprings] as of January 1, 2018." DeLacy further opined at trial that PPAs and PTCs must be included in the ad valorem valuation for it to be meaningful

because Texas allows an income approach to valuate wind farms, and the PPAs and PTCs are sources of income.

Although DeLacy acknowledged the Uniform Standards of Professional Appraisal Practices ("USPAPs") require an appraiser to recognize and comply with the laws and regulations that apply to the appraisal assignment, he admitted he did not review Texas law and did not take into consideration whether something was taxable or not taxable under Texas law when valuating Rocksprings. However, after performing his valuation, DeLacy determined that the PTCs and PPAs were "indirectly involved" with Rocksprings's ad valorem tax valuation so he included them in his valuation, claiming it represented the market value as provided by Texas law. According to DeLacy, he followed counsel's direction and believed his report complied with Texas law.

## B. *Grafe's Approach to Valuation of Rocksprings*

Rocksprings's expert appraiser, Grafe, has appraised properties since 1985. Grafe and his firm have experience in valuating land upon which wind farms sit as well as proposed wind farms in Texas. Grafe stated that when performing a valuation of a wind farm in Texas for purposes of ad valorem valuation, the application of Texas laws "would always be the same." The USPAPs are promulgated by the appraisal foundation, and certified appraisers are bound by the standards of practice and code of ethics to follow the laws of the state in which they are appraising property. Grafe asserted his valuation of Rocksprings would not have changed even if performing the valuation for the Val Verde CAD because he would apply the same Texas laws regarding whether tangible and intangible assets are included in the valuation.

Grafe explained, in this context, the key to the case is determining the real and tangible personal property subject to taxation. Grafe opined that under the cost approach, he started with the valuation of Rocksprings for January 2018 at $251,763,385, then reduced that valuation by an

amount calculated for the functional and external obsolescence, arriving at a valuation of $99,446,537. Grafe then reduced this amount by a discounted value over a twenty-five-year time span to arrive at his cost approach valuation of $69,612,576, rounded to $69,610,000. Grafe acknowledged that he deducted a significant amount for the expected amount of time the wind farm would not be producing power but explained that the cost to construct the wind farm would never be justified absent PPAs and the PTCs, which are intangibles and not subject to taxation in Texas.

When using the income approach, Grafe testified he utilized a yield capitalization analysis otherwise known as a yield discounted cash flow analysis. After accounting for the risk associated with transmitting the energy generated at the wind farm to the open market grid, accounting for projected expenses, and applying the discounted value of the projected income over the twenty-five-year life-span of a wind farm, Grafe estimated Rocksprings's ad valorem tax valuation under the income approach at $65,220,000. After reconciling his valuation under the cost and income approaches, Grafe valuated Rocksprings at $67,500,000 on January 1, 2018, for purposes of ad valorem taxes. Grafe opined that the main differences between his valuation and DeLacy's valuation was that DeLacy included the value of the PPAs and PTCs in his valuation and Grafe did not. Grafe's criticism of DeLacy's valuation focused on: (1) DeLacy's inclusion of these intangible assets that are not allowed to be taxed in Texas, (2) DeLacy's income growth rate at a much higher percentage than his estimate without adjusting expenses at a similar rate, and (3) DeLacy's method used for accounting for the land lease expenses in the future. Grafe also explained that his income estimates for the future were less than DeLacy's expectation because Grafe recognized the price of power was decreasing across Texas.

Notably, DeLacy agreed that if he started with his valuation and then subtracted the above-market rates associated with the PPAs and the PTCs, DeLacy's valuation would be close to Grafe's valuation. The difference between DeLacy's valuation and Grafe's valuation comes down to the inclusion of the PTCs and PPAs in valuating Rocksprings.

### ANALYSIS

As mentioned above, the disparity between DeLacy's and Grafe's valuation of Rocksprings is attributable to the inclusion of the PTCs and PPAs in DeLacy's valuation. Rocksprings contends DeLacy's report incorrectly inflates his valuation by improperly including intangible assets—the PTCs and PPAs. Rocksprings argues the erroneous inclusion of intangible assets in the valuation caused it to be taxed on its business enterprise value rather than the ad valorem taxation value of its property. It is undisputed that DeLacy's valuation included the PTCs and PPAs. The critical issue here is whether DeLacy's expert opinion correctly applied Texas law when he included the PTCs and PPAs in his ad valorem tax valuation. If the PTCs and PPAs are intangible assets that are not subject to ad valorem taxes, then DeLacy's expert opinion is unreliable because his methodology did not correctly apply Texas tax law and the trial court should have excluded his testimony. Consequently, in that instance, DeLacy's testimony would amount to no evidence at all to support the jury's verdict. *See Havner*, 953 S.W.2d at 714.

Val Verde CAD solely relies on DeLacy's valuation that includes the PTCs and PPAs because DeLacy opined they are "integral to both" the cost approach in building the wind farm and the income approach as sources of income. Val Verde CAD maintains that PTCs and PPAs are interests in tangible property and thus taxable because such interests are indistinguishable from the tangible property itself. Val Verde CAD reasons "Texas courts have repeatedly found that individual characteristics of a property that contribute significantly to its value" may be taxed. In

other words, Val Verde CAD argues the PTCs and PPAs are inextricably intertwined with the underlying property, and Texas courts have already indirectly determined that they must be included in an ad valorem tax valuation.

Despite Val Verde CAD's contention, we have not located any Texas authority stating PTCs and PPAs are subject to ad valorem taxes. Nonetheless, other states have provided some guidance.

*A. PTCs*

In 2022, Oklahoma addressed whether PTCs associated with a wind farm are taxable under an ad valorem taxation framework similar to that of Texas's framework. *See Kingfisher Wind, LLC v. Wehmuller*, 521 P.3d 786 (Okla. 2022). Under the Oklahoma Constitution, intangible personal property is not subject to ad valorem tax. *See id.* at 787 & n.2. The Oklahoma Supreme Court held that "PTCs are intangible personal property[] and are not subject to ad valorem taxation pursuant to the [Oklahoma Constitution]." *Id*. at 787, 794. While recognizing that PTCs have a direct impact on a property's fair market value and that ad valorem tax assessment must be based on fair market value, the *Kingfisher* Court clarified that PTCs "are not a tangible physical thing like real estate." *Id.* at 792. "Instead, they are incorporeal property in that they have limited intrinsic value, and ultimately can only be claimed or enforced by a legal action, much like goodwill, even if they are intrinsically tied to a business or real property." *Id.* The court added that if PTCs are meant to be taxable for ad valorem purposes, the state's legislature needs to change the current law. *See id.* at 794. "Until it does so, [PTCs] are not subject to taxation." *Id*.

In arriving at its conclusion, the *Kingfisher* Court also engaged in an extensive review of other states' approaches to taxing PTCs, many of which Val Verde CAD relies on to support its argument. *See id*. at 792–94. The *Kingfisher* Court emphasized that although some states taxed

PTCs, it was not because those states determined that PTCs were tangible assets. *See id.* Rather, the states that tax PTCs have different constitutional and statutory approaches to ad valorem taxation that allow the taxation of intangible personal property for various reasons. *See id.* at 792.

Val Verde CAD attempts to rely on two Texas cases addressing the ad valorem taxation of saltwater injection wells as authority to subject PTCs to taxation. *See Bosque Disposal Sys., LLC v. Parker Cnty. Appraisal Dist.*, 555 S.W.3d 92 (Tex. 2018); *Key Energy Servs., LLC v. Shelby Cnty. Appraisal Dist.*, 428 S.W.3d 133 (Tex. App.—Tyler 2014, pet. denied). These cases concerned whether the wells can be appraised separately from the land without resulting in double taxation. *See Bosque*, 555 S.W.3d at 93; *Key Energy*, 428 S.W.3d at 143–44, 146. Neither opinion, however, addresses whether intangible personal property may be deemed "an interest in tangible property" and thus subject to taxation. *See Bosque*, 555 S.W.3d at 95, 99–100 (stating the wells' physical underground existence is "hardly incorporeal" while rejecting the taxpayer's suggestion that the wells should be considered intangible assets because the only real value of the well concerned the right to inject saltwater into the wells); *Key Energy*, 428 S.W.3d at 144. Rather, after considering the physical underground facilities, the wells were determined to be tangible assets because the wells were an improvement to or an interest in real property. *See Bosque*, 555 S.W.3d at 96; *Key Energy*, 428 S.W.3d at 145–46; *see also Coastal Liquids*, 165 S.W.3d at 335–36 (determining the physical facilities of the underground structures combined with manmade elements with the ground itself were taxable improvements). In contrast here, the PTCs cannot be characterized as an improvement appurtenant to the real property that can be "seen, weighed, measured, felt, or otherwise perceived by the senses . . . ." TEX. TAX CODE ANN. § 1.04(5) (defining "tangible personal property"). Instead, they are more akin to an "interest (other than an interest in tangible property), right, or other thing that has value but cannot be seen, felt, weighed, measured,

or otherwise perceived by the senses[—]although its existence may be evidenced by a document[—such as] a stock, bond, note or account receivable, franchise, license or permit, . . . annuity, pension, cause of action, contract, and goodwill." *Id*. § 1.04(6) (defining "intangible personal property").

We agree with Rocksprings's argument that the PTCs are intangible assets that are not inextricably intertwined with the valuation of the property itself. Rather, *when* Rocksprings generates clean power, the PTCs are an economic benefit to the tax equity investors allowing them to use the tax credits to reduce their income tax liability. While necessary to facilitate the construction of wind farms, Rocksprings receives no return of revenue or additional investment income or assets from the tax equity investors' ownership of the PTCs; instead, the tax equity investors are the only parties who utilize the tax credits to offset their tax liability to the Internal Revenue Service.

Accordingly, we hold PTCs are intangible personal property that are exempt from ad valorem taxation under Texas tax law. *See* TEX. TAX CODE ANN. § 11.02(a).

*B. PPAs*

While we also cannot locate any Texas authority specifying whether PPAs are tangible or intangible property, the Texas Tax Code specifically designates contracts as intangible personal property. *See id.* § 1.04(6). The PPA agreements with Wal-Mart and 3M are contracts to sell power generated by Rocksprings for agreed upon rates, and any above-market value directly or indirectly attributed to the PPAs must be excluded from Rocksprings's valuation for ad valorem tax purposes. *See Cent. Appraisal Dist. of Taylor Cnty. v. W. AH 406, Ltd.*, 372 S.W.3d 672, 693 (Tex. App.—Eastland 2012, pet. denied) (concluding favorable financing contracts fall within the definition of "intangible personal property" and are not taxable in contrast to the rent and occupancy restrictions

that the court determined were covenants that ran with the land for the entire forty-year term of the agreement).

Moreover, specific to PPAs, we agree with the Supreme Court of Oregon's reasoning when faced with an issue like the one here. In *Seneca Sustainable Energy, LLC v. Department of Revenue*, 429 P.3d 360, 369–72 (Or. 2018), the Supreme Court of Oregon had to determine whether the PPA negotiated by the property owner was taxable using the income approach under an ad valorem taxation framework similar to ours in Texas, which excludes intangible assets from ad valorem taxation. Relying on a statutory definition that defines contracts as intangible assets, the *Seneca* Court determined the PPA in that case was an intangible asset not subject to taxation under the state's governing law. *See id.* at 373 ("[I]t is not clear to us that there is a legitimate distinction to be drawn between taxing a contract itself and taxing, essentially, the effect of a contract on revenue, when the revenue earned is dependent on and determined by terms unique to that contract."). The court explained that including the PPAs in an ad valorem tax valuation would overinflate the value of the energy company because the PPA "provided Seneca with revenues significantly in excess of what a purchaser of the property on the assessment date would have been able to negotiate[.]" *Id.* ("Because the rates set out in the power purchase agreement are significantly above the market rates, the power purchase agreement simply does not reflect the income Seneca's cogeneration facility may reasonably be expected to produce on the assessment date and thereafter.") (internal quotations omitted).

We conclude PPAs are contracts and, as intangible personal property, they may not be taxed under the Texas Tax Code and must be excluded from an ad valorem tax valuation. *See* TEX. TAX. CODE ANN. §§ 1.04(6), 11.04(a); *compare W. AH 406 Ltd. v. Cent. Appraisal Dist. of Taylor Cnty.*, 213 S.W.3d 544, 546–47 (Tex. App.—Eastland 2007, pet denied) (explaining the rent and

occupancy restrictions that decreased the property's market value must be considered in the valuation because they were restrictive covenants running with the land), *with Seneca*, 429 P.3d at 373 (concluding a PPA is an intangible asset and thus the PPA's value is not subject to ad valorem taxation), *and Cent. Appraisal Dist. of Taylor Cnty. v. W. AH 406, Ltd.*, 372 S.W.3d 372, 693 (Tex. App.—Eastland 2012, pet. denied) (concluding the favorable financing agreements that increased the property's market value were intangible personal property excluded from taxation for ad valorem purposes).

DeLacy improperly valuated Rocksprings as an entire business enterprise when he included the PTCs and PPAs in his valuation. DeLacy appeared to acknowledge PTCs and PPAs were intangible personal property but claimed they needed to be included in his valuation of Rocksprings—especially when using the income approach—because they were "inextricably intertwined" to the operation of the wind farm. However, under the Texas Tax Code, only taxable property shall be valuated when using acceptable methods to valuate property for ad valorem purposes. *See* TEX. TAX. CODE ANN. § 23.01(a).

Because DeLacy improperly included intangible property in his ad valorem tax valuation, his expert opinion was unreliable and should have been excluded. *See Gregg Cnty. Appraisal Dist. v. Laidlaw Waste Sys., Inc.*, 907 S.W.2d 12, 20 (Tex. App.—Tyler 1995, writ denied) (explaining trial court correctly excluded appraisals that improperly commingled the valuation of the business enterprise with the valuation of the property subject to ad valorem taxation). Absent DeLacy's expert testimony, there is legally insufficient evidence to support the jury's verdict valuating Rocksprings at $197,400,000. Without sufficient evidence to support the jury's verdict, the valuation cannot stand. *See EXLP Leasing*, 554 S.W.3d at 578 ("Exactly what 'market value' means for taxation purposes depends on the circumstances at hand and the rules the legislature

prescribed for them.") (citing *Tarrant Appraisal Dist. v. Colonial Country Club*, 767 S.W.2d 230, 234 (Tex. App.—Fort Worth 1989, writ denied) ("One should not lose sight of the fact that the valuation is used only for purposes of taxation. . . . What would occur in an actual sale would have no bearing on the proper valuation for tax purposes.")).

### VALUATION UNCERTAIN FROM THE ADMISSIBLE EVIDENCE

In addition to valuations provided by the parties' experts, other valuations were discussed relating to Rocksprings's valuation. Nevertheless, with the exception of two valuations, none of the other valuations pertained to valuating Rocksprings for purposes of ad valorem taxation. Specifically, evidence of the initial protested appraised valuation from the Val Verde CAD in the amount of $176,454,480 was admitted, as was evidence of the reduced valuation from the Val Verde County appraisal review board following the protest hearings in the amount of $101,400,000. The other valuations, provided by independent accounting firms, ranging from $235,936,717 to $246,000,000, were prepared solely for the purpose of providing Rocksprings's independent audited financial statements and an investment portfolio for potential tax equity investors. Both the financial statements and the investment portfolio provided warnings that the reports were prepared solely for the purpose of the report and should not be used for any other purposes. The reports valuated the overall financial position or business enterprise of Rocksprings, not Rocksprings's ad valorem tax valuation.

### CONCLUSION AND REMEDY ON APPEAL

Because we conclude the testimony of the Val Verde CAD's expert appraiser, DeLacy, was legally insufficient to support the jury's verdict, we sustain Rocksprings's issues on appeal. Although there was some evidence of Rocksprings's market value for purposes of ad valorem taxation from the appraisals of Rocksprings prior to the lawsuit and Grafe's valuation, the evidence

did not conclusively establish the taxable valuation without the intangible assets. Thus, this court is unable to ascertain an amount certain to suggest a remittitur. Therefore, we reverse and must remand the cause for a new trial consistent with this opinion.

Irene Rios, Justice